In the

# United States Court of Appeals
## For the Seventh Circuit

No. 11-2035

NATHSON FIELDS,

*Plaintiff-Appellee,*

*v.*

LARRY WHARRIE AND DAVID KELLEY,

*Defendants-Appellants.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 10 C 1168—**Matthew F. Kennelly**, *Judge.*

ARGUED DECEMBER 6, 2011—DECIDED FEBRUARY 28, 2012

Before POSNER, FLAUM, and SYKES, *Circuit Judges*.

FLAUM, *Circuit Judge*. Nathson Fields was wrongly convicted of two murders. Twenty-five years after his ordeal began, he was exonerated, and he presently seeks money damages from those state officials he holds responsible for his conviction. Among others, he names Cook County, Illinois Assistant States Attorneys ("ASA") Larry Wharrie and David Kelley, alleging that they induced false testimony during his trial and subsequent retrial, suppressed the compromised nature of this testi-

mony and its acquisition from him, and denied him due process.

Wharrie and Kelley raise an interlocutory appeal, challenging that the district court improperly refused them absolute immunity from Nathson Fields' claims against them under 42 U.S.C. § 1983. They also appeal the district court's determination that it enjoyed supplemental jurisdiction over Fields' state-law claims pursuant to 28 U.S.C. § 1367. They contend that Illinois sovereign immunity law precludes federal jurisdiction, and only the Illinois Court of Claims may hear Fields' state-law claims.

We reverse the district court in part and find (1) that Wharrie is entitled to absolute immunity for his alleged solicitation of false testimony from Earl Hawkins after Fields' original trial, as well as for his alleged suppression of its falsity; and (2) that Fields failed to state a claim against Kelley with respect to his alleged coercing Randy Langston's testimony. We affirm the district court's holding that it has jurisdiction over Fields' state-law claims, but suggest that it consider relinquishing jurisdiction to the state court.

## I. Background

### A. Factual Background

In 1986, Fields, a member of the El Rukn street gang, was convicted of murdering Talman Hickman and Jerome Smith. He and his co-defendant, Earl Hawkins, were sentenced to death.

Fields alleged that, in preparation for and during his trial, Chicago police officers and ASA Wharrie solicited false testimony against him from a fellow El Rukn gang member, Anthony Sumner, whom they had arrested in connection with separate murders. He maintains that the police coerced Sumner to falsely implicate him in Hickman and Smith's murders, as well as those for which Sumner was arrested. Sumner received a non-prosecution agreement in exchange for his testimony, which, in 1991, he confessed was false.

Fields' appeal was ultimately denied. He then petitioned for post-conviction relief. In 1996, a state-court judge granted him a new trial, but did so on grounds other than Sumner's testimony. The judge ordered the new trial in light of evidence that Fields' co-defendant, Earl Hawkins, bribed the initial trial judge, Thomas Maloney, to assure his own acquittal. Hawkins was convicted and Maloney returned the money when he realized that federal authorities were investigating him; however, the post-conviction state-court judge concluded that Maloney's pervasive corruption denied Fields due process.

In 2009, following his second trial, the jury acquitted Fields. He received a certificate of innocence.

Fields then sued the County of Cook; the City of Chicago and its current and former officials; several Chicago police officers; and ASAs Wharrie and Kelley under Section 1983 and Illinois law. Pursuant to Section 1983, he claimed that the defendants deprived him of due process by engaging in suggestive identification

procedures, deliberately suppressing exculpatory evidence, coercing witnesses to provide false evidence, and suborning perjury. He claimed that individual defendants failed to intervene to prevent the violation of his constitutional rights, as well as that individual defendants conspired to frame him for murder. Under Illinois law, he claimed malicious prosecution, intentional infliction of emotional distress, civil conspiracy, respondeat superior, and indemnification.

According to Fields, Wharrie feared that a retrial would reveal that he coerced Sumner's testimony. Therefore, Fields alleged, in 1987, while his direct appeal was pending, Wharrie solicited false testimony from Earl Hawkins, asking him to identify Fields as the shooter and verify Sumner's account of the murders to conceal his own wrongdoing. In exchange for this revised testimony, as well as testimony against other El Rukn gang members, Wharrie arranged for Hawkins' removal from death row.

The prosecution did not introduce Hawkins' revised account of the murders during Fields' appeal. Indeed, the prosecution did not use Hawkins' testimony until a decade later when, in 1998, ASA Kelley agreed to dismiss untried murder charges against him in exchange for his testimony against Fields at retrial.

Fields raised additional claims against ASA Kelley, claiming that Kelley coerced eyewitness Randy Langston to falsely identify him during his retrial as involved in the murders. During the original trial, Langston testified that Fields was involved, but he

later recanted his identifications. He testified during Fields' sentencing that he had been coerced by Chicago police to incriminate Fields. Fields contended that Kelley knew Langston had recanted, but nonetheless proffered his false testimony during retrial.

Fields alleges that at no time did either Wharrie or Kelley disclose to him the tactics they employed to elicit the testimony against him or that the testimony was false.

## B.  Procedural Background

Wharrie and Kelley moved to dismiss Fields' Third Amended Complaint against them as barred by absolute prosecutorial immunity and by Illinois sovereign immunity law.

The district court denied their motion in part. It rejected absolute prosecutorial immunity for Wharrie from the allegation that he negotiated for Hawkins' false testimony at retrial and suppressed its falsity from Fields. Since Wharrie no longer participated on the team prosecuting Fields during his appeal or at his second trial, nor acted on its behalf when he induced Hawkins' incriminating statements, the court found him entitled only to qualified immunity.

The district court also rejected absolute immunity for Kelley from the allegation that he coerced false statements from Randy Langston at retrial. The court stated that he was entitled to absolute immunity for his use of the statements at trial and for withholding exculpatory

evidence on the means by which the statements were obtained, but it concluded that qualified immunity was the proper standard to apply to the act of coercion itself. The court only "assum[ed] that this conduct did not merit the protection of absolute immunity." It provided no further justification for this assumption.

Finally, the court rejected Wharrie and Kelley's argument that Illinois sovereign immunity law preempted its jurisdiction over Fields' state-law claims against them. The court found that, in this case, the necessary criteria were not satisfied to treat claims against individual officers in their personal capacities as claims against the State. It retained jurisdiction.

Wharrie and Kelley appeal these judgments.

## II. Discussion

A district court's denial of a motion to dismiss based on absolute immunity or state sovereign immunity are questions of law that we review de novo. *See Richman v. Sheahan*, 270 F.3d 430, 434 (7th Cir. 2001). We construe the complaint in the light most favorable to Fields, "accepting as true all well-pleaded facts alleged, and drawing all possible inferences in [his] favor." *See Heyde v. Pittenger*, 633 F.3d 512, 516 (7th Cir. 2011).

## A.  The Scope of a Prosecutor's Absolute Immunity

A prosecutor is absolutely immune from suit for all actions and decisions undertaken in furtherance of his

prosecutorial duties. *Imbler v. Pachtman*, 424 U.S. 409, 410 (1976). Whether or not an action falls within the scope of his prosecutorial duties depends upon its function. *See Van de Kamp v. Goldstein*, 555 U.S. 335, 342-43 (2010) (citing *Burns v. Reed*, 500 U.S. 478, 486 (1991)). The analysis hinges on whether the prosecutor is, at the time, acting as an officer of the court, as well as on his action's relatedness to the judicial phase of the criminal process. *Imbler*, 424 U.S. at 430, 431 n.33.

Absolute immunity extends beyond an individual prosecutor's decision to indict or try a case. *See Van de Kamp*, 555 U.S. at 344-48. The protection endeavors to preserve the functioning of the public office, *id.* at 345 (citing *Kalina v. Fletcher*, 522 U.S. 118, 125 (1997)), and, thus, encompasses any action directly relevant to a prosecutor's ability to conduct a trial. *Id.* at 344 (distinguishing between administrative actions like training prosecutors on properly disclosing to the defense material evidence, which are shielded as prosecutorial functions, and administrative decisions such as workplace hiring and facilities management, which do not fall withing the ambit of absolute immunity).[1]

---

[1] We reiterate that absolute immunity for prosecutorial functions protects judicial resources by preventing the retrial of every criminal offense in a new forum, as well as encourages prosecutors to volunteer for and vigorously perform the job by shielding them from frivolous suits and the corresponding litigation costs. *See Buckley v. Fitzsimmons*, 509 U.S. 259, 270 n.4 (1993) ("*Buckley III*") (citing *Imbler*, 424 U.S. at 424-25).

Nevertheless, a prosecutor has job responsibilities that are not prosecutorial in nature. There exists a "difference between [his] advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial . . . and [his] detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested . . . ." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) ("*Buckley III*"). Actions and decisions made in accordance with the latter set of responsibilities entitle him only to the qualified immunity granted to the police and other members of the prosecution team who share those duties. *Id.* (citing *Hampton v. Chicago*, 484 F.2d 602, 608 (7th Cir. 1993)).

### 1. ASA Wharrie

Fields contends that ASA Wharrie suppressed the fact that he asked Hawkins to lie if Fields were retried, which was not a prosecutorial decision. He relies on *Houston v. Partee*, 978 F.2d 362 (7th Cir. 1992), an earlier case before us in which Wharrie was sued under Section 1983 for due process violations and received only qualified immunity. In *Partee*, Wharrie prosecuted to conviction Elton Houston and Robert Brown for murder. While Houston and Brown's appeals were pending, Wharrie participated in a long-term investigation into the El Rukn gang and several of its members. As part of that investigation, Anthony Sumner was arrested and, subsequently, agreed to become a cooperating witness. As he detailed numerous

crimes that he and the El Rukn committed, he disclosed to prosecutors, including Wharrie, that J.L. Houston, Earl Hawkins, and Derrick Kees committed the murder for which Elton Houston and Brown were convicted. Wharrie never volunteered this information to Elton Houston and Brown. When Elton Houston and Brown's counsel requested any favorable details that Sumner had revealed, Wharrie told them that he had received none.

Several years later, Hawkins confessed to the murder and corroborated Sumner's account, exonerating Elton Houston and Brown. Houston and Brown sued Wharrie under Section 1983. As he does now, Wharrie invoked absolute immunity. We denied that protection and concluded that Wharrie enjoyed only qualified immunity because he "had already succeeded in obtaining the convictions of Houston and Brown, and the prosecution of Houston's and Brown's appeal had been passed on to others in the State's Attorney's office." *Id*. at 366. We held that absolute immunity does not continue indefinitely, but ends once a prosecutor is no longer associated with the disposition of an individual case. *Id.* at 366-67.

Relying on our *Partee* holding, Fields argues that since Wharrie neither defended against his direct appeal nor prosecuted him on retrial, he no longer functioned as a prosecutor when he suppressed the false nature of Hawkins' retrial testimony against him.

Wharrie counters that the Supreme Court's ruling in *Van de Kamp v. Goldstein*, 555 U.S. 335, overrules *Partee* to the extent that it held that a prosecutor's direct par-

ticipation on a trial or appellate team is required for absolute immunity. In *Van de Kamp*, the Court considered whether or not an individual prosecutor's supervisors received absolute immunity for their failure to train him on proper disclosure under *Giglio v. United States*, 405 U.S. 150 (1972), which resulted in a violation of the defendant's due process. 555 U.S. at 343-44. In granting absolute immunity, the Court questioned whether absolute immunity would apply where a plaintiff sought damages "not only from the trial prosecutor but also from a supervisory prosecutor or from the trial prosecutor's colleagues—all on the ground that they should have found and turned over . . . impeachment material . . . ." 555 U.S. at 345. The Court concluded that absolute immunity would apply to all of these prosecutors because their behavior, "taken individually or separately, would involve preparation for trial and would be intimately associated with the judicial phase of the criminal process because it concerned the evidence presented at trial." *Id.* (internal quotation marks, omissions, and citations omitted). Wharrie claims that, like the Court's hypothetical, his suppression in *Partee* and at issue here concerned the evidence presented at trial or on appeal such that it is of no moment that he solicited the evidence in question when he was not the designated prosecutor on the case.

### i. *Brady* and *Giglio* Obligations Are Functionally Prosecutorial

Like all determinations into the type of immunity available for a prosecutor, this inquiry is context-depend-

ent. Prosecutors do not function as advocates before probable cause to arrest a suspect exists. *See Buckley III*, 509 U.S. at 274. If a prosecutor plants evidence before someone is arrested, he enjoys only qualified immunity. *See id.* at 275-76 (holding that a prosecutor's fabrication of false evidence before a suspect was arrested or a grand jury was empaneled merited qualified immunity because "[a] prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as 'preparation' for a possible trial"). Yet, for that same fabrication of evidence, if he commits the act during a judicial proceeding, he receives absolute immunity. *See Burns*, 500 U.S. at 489-92. The question before us, then, is whether, once judicial proceedings have been initiated, the trial prosecutor, who fabricates evidence after the trial, ceases to function in a prosecutorial manner once he is no longer the specific prosecutor handling the appeal or retrial.

In *Partee*, we answered this question affirmatively. We concluded that once a prosecutor stopped participating on a particular trial team, his "knowledge of and failure to disclose [material evidence] . . . had no connection to [his] role as advocate for the State." *Partee*, 978 F.2d at 366. The Supreme Court's reasoning in *Van de Kamp*, however, suggests that a prosecutor's direct participation in an appeal or retrial is no longer dispositive of his right to absolute immunity. The Court's hypothetical conferred absolute immunity upon a prosecutor's colleagues and supervisors—who may not have

been directly involved in his particular case—for their failure to satisfy their disclosure obligations under *Giglio*, 405 U.S. 150, and *Brady v. Maryland*, 373 U.S. 83 (1963). *Van de Kamp*, 555 U.S. at 345.

The Court did not explicitly state that the colleagues and supervisors had any individual *Brady* or *Giglio* obligations. *See Van de Kamp*, 555 U.S. at 344-45. That is, it did not expressly instruct us that every individual prosecutor in an office owes a *Brady* or *Giglio* obligation to a defendant solely due to his employment in the office, regardless of whether or not he is involved in that defendant's prosecution.[2] Yet, for purposes of the hypothetical, the Court *assumed* that the supervisors and office prosecutors in question had *Brady* and *Giglio* obligations to the defendant and suggested that, insofar as these disclosure responsibilities existed, absolute immunity applied. Hence, *Brady* and *Giglio* duties are functionally prosecutorial—they are intimately related to the judicial phase of the criminal process. *See Imbler*, 424 U.S. at 430; *see also Brady*, 373 U.S. at 87 ("[S]uppression by the prosecution of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.").

While other state actors, like the police, share the prosecutor's constitutional obligation to disclose exculpatory

---

[2] The Supreme Court, therefore, has not overruled our view that "absolute immunity [does not] indefinitely attach[] to every [prosecutor in an office] once a prosecution begins." *See Partee*, 978 F.2d at 366.

evidence to the defendant, the prosecutor owes a distinct, if not heightened, disclosure obligation to the defendant once judicial proceedings commence. *See Arizona v. Youngblood*, 488 U.S. 51, 56-58 (1988) (recognizing that police have a due process obligation to preserve and disclose evidence they know to have exculpatory value and distinguishing that duty, and the framework by which it is analyzed, from one imposed by *Brady*). As the Court explained in *Brady*, the prosecutor is the "architect" of the trial, 373 U.S. at 87-88, and his purpose is to both secure criminal convictions and ensure that "criminal trials are fair," *id.* at 87, even where his police officers would not. *See also Kyles v. Whitley*, 514 U.S. 419, 438 (1995) (identifying the prosecutor as "the final arbiter[] of the government's obligation to ensure fair trials"). Thus, we impose upon the prosecutor the responsibility to disclose not only any evidence within his own files, *see United States v. Agurs*, 427 U.S. 97, 110 (1976), but also any evidence possessed exclusively by those actors assisting him in investigating and trying his case, *see Whitley*, 514 U.S. at 437 ("[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf . . . ."). Once a defendant is indicted, the disclosure obligation and the due process in question correspond to his trial rights, and a prosecutor's failure to uphold that obligation, in the form of suppression, coincides with his prosecutorial function.

One might argue that since we allow civil suits against police officers for causing *Brady* violations, *see, e.g., Holland v. City of Chicago*, 643 F.3d 248, 255 (7th Cir.

2011) (noting that "police officers can be held liable under *Brady* and its progeny when they withhold exculpatory evidence from prosecutors and the withholding of evidence is 'material'"), failure to fulfill due process in this manner is not a functionally prosecutorial action. In our view, however, a *Brady* violation is not committed unless and until a prosecutor, in the course of preparing for or conducting a trial or direct appeal, does not turn over the material evidence in question. *See* discussion of *Buckley v. Fitzsimmons* ("*Buckley IV*") *infra* Part II.A.1.iv. *Brady* and *Giglio* violations breach a defendant's trial rights and are, thus, inherently prosecutorial in nature. Allowing a police officer to be sued for his role in eventually causing the prosecutor to violate *Brady* or *Giglio* does not alter the nature of the violation.

We recognize that this analysis allows for police officers to potentially incur financial liability where a prosecutor may not, even though the prosecutor and the police officers may both fabricate or suppress evidence. Herein lies the rub: absolute immunity doctrine focuses on whether the nature of the action is prosecutorial, not the fact that the actor is a prosecutor; *Brady* and its progeny, by contrast, elevate the prosecutor—qua prosecutor—as ultimately responsible for fulfilling the State's obligation to provide fair process. *See Brady*, 373 U.S. at 87-88; *see also Whitley*, 514 U.S. at 538; *Agurs*, 427 U.S. at 111. Under *Brady*, the office of prosecutor entails a special duty to "get it right." Perhaps counterintuitively, this heightened duty carries with it greater immunity from financial liability. Yet, so long as

we view *Brady* and *Giglio* as distinct versions of the right to due process, and the prosecutor as responsible for ensuring *Brady* and *Giglio* compliance, we must also recognize that in fulfilling this responsibility, the prosecutor acts as an officer of the court embroiled in the judicial phase of the criminal process, *see Imbler*, 424 U.S. at 430, 431 n.33. For the reasons we value absolute prosecutorial immunity, *see supra* note 1, a prosecutor is entitled to the protection with respect to his actions and decisions pertaining to his fulfillment of *Brady* and *Giglio*.

Our immunity analysis, therefore, must focus not only on whether a prosecutor is actively participating on a trial team when he suppresses material evidence, but also on whether he owes a continuing *Brady* or *Giglio* obligation to the defendant in question. If he does, he functions as a prosecutor when he commits the suppression.[3]

---

[3] Since *Imbler*, the Court has rejected the distinction between suppressing exonerating evidence and fabricating incriminating evidence as relevant for purposes of invoking absolute prosecutorial immunity because "[t]he distinction is not susceptible of practical application. A claim of using perjured testimony simply may be reframed and asserted as a claim of suppression of the evidence upon which the knowledge of perjury rested." 424 U.S. at 431 n.34; *see also Van de Kamp*, 555 U.S. at 343.

### ii. A Prosecutor's *Brady* and *Giglio* Duties Persist Until a Defendant's Conviction Becomes Final

A prosecutor's *Brady* and *Giglio* duties may survive the conclusion of a trial. *See Imbler*, 424 U.S. at 427 n.25 ("[A]fter a conviction, the prosecutor is also bound by the ethics of his office to inform the appropriate authority of after-acquired or other [material] information that casts doubt upon the correctness of the conviction."). When a State grants a criminal defendant a right to direct appeal, "the proceedings in the appellate tribunal are . . . part of the process of law under which he is held in custody by the State, and to be considered in determining any question of alleged deprivation of his life or liberty contrary to the Fourteenth Amendment." *Frank v. Magnum*, 237 U.S. 309, 327 (1915) (internal citations omitted); *see also Evitts v. Lucey*, 469 U.S. 387, 393 (1985) ("[I]f a State has created appellate courts as an integral part of the system for finally adjudicating the guilt or innocence of a defendant, the procedures used in deciding appeals must comport with the demands of the Due Process and Equal Protection Clauses of the Constitution.") (internal citations omitted). Therefore, a defendant's conviction is not final as a matter of law until he exhausts the direct appeals afforded to him, and, until that exhaustion, he is entitled to the full breadth of due process available. *See Gonzalez v. Thaler*, No. 10-895, 2012 WL 43513, at *3, 9 (S. Ct. Jan. 10, 2012) (holding that "[f]or petitioners who pursue direct review all the way to [the Supreme Court], the judgment becomes final at the conclusion of direct review—when this Court affirms a conviction on the merits or denies

a petition for certiorari [and that] [f]or all other petitioners, the judgment becomes final at the expiration of the time for seeking such review—when the time for pursuing direct review in this Court, or in state court, expires"); *Skinner v. Switzer*, 131 S. Ct. 1289, 1303 (2011) (Thomas, J., dissenting) (explaining that "[t]rial procedures are used to initially convict a prisoner; appellate procedures review the validity of that conviction *before it becomes final*; and collateral review procedures permit challenge to the conviction after it is final") (emphasis added). Accordingly, a prosecutor's *Brady* and *Giglio* obligations remain in full effect on direct appeal and in the event of retrial because the defendant's conviction has not yet become final, and his right to due process continues to demand judicial fairness. *See Monroe v. Blackburn*, 476 U.S. 1145, 1148-49 (1986) (Marshall, J., dissenting from denial of certiorari) ("When the sovereign has decided that justice will be best served by qualifying the finality of a conviction so that a convicted defendant may yet prove his innocence, its attorney is not free to choose otherwise. And until factfinding proceedings, or the possibility of them, is [sic] terminated, the State remains bound by the rules of simple fairness that *Brady* held to be of constitutional dimension."). His disclosure responsibilities do not end until the defendant either has been acquitted or has availed himself of all the direct process to which he is entitled. *See Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 129 S. Ct. 2308, 2320 (2009) (distinguishing a defendant's due process interest in his postconviction relief after he has received a fair trial from his interest

before his conviction becomes final and rejecting *Brady* and *Giglio* as continuing obligations on collateral challenge).

### iii. ASA Wharrie is Absolutely Immune From Suit

The district court suggests that because Wharrie was preparing for other trials and no longer directly involved in Fields' appeal or retrial, this fact wrests from him his prosecutorial function. We disagree. Wharrie knew the case's evidentiary strengths and weaknesses; he knew what mistakes transpired during the original trial; he conducted the interviews with the original witnesses; he knew how those witnesses' testimony had been acquired; he knew how those witnesses' stories had or had not changed over time; and he knew what, if any, relevant information had been acquired in the course of the State's Attorney's Office's further investigations into the El Rukn gang's criminal activities. His *Brady* and *Giglio* obligations did not expire because he no longer personally handled the appeal or retrial. *See Giglio*, 405 U.S. at 154 (finding that where an individual prosecutor presented the Government's case to the grand jury, but did not try the case, the individual prosecutor's uninvolvement with the trial was not controlling, and his failure to inform his supervisors or associates about material evidence violated *Brady*); *see also Evans v. Virginia*, 471 U.S. 1025, 1029 n.3 (1985) (Marshall, J., dissenting from denial of certiorari) (citing *Giglio*, 405 U.S. at 154) (stating that for purposes of a *Brady* or *Giglio* violation, "it [does not] matter whether

the state attorney who appeared at the sentencing hearing, and who admitted that he knew the evidence on which the State relied was false, took part in preparing the State's briefs [on appeal]. The prosecutor's office is an entity, not just a group of isolated individuals, and the [original] prosecutor is responsible for assuring that relevant information is communicated among the lawyers in the office"). As the original prosecutor on the case, Wharrie had a continuing *Brady* obligation to reveal material evidence to the defense until Fields' conviction became final, as the ongoing judicial process continued to evolve. *See Imbler*, 424 U.S. at 427 n.25; *Agurs*, 427 U.S. at 111 (noting "special significance to the prosecutor's obligation to serve the cause of justice"). He was not an uninvolved prosecutor in the office who had never before heard of the case or knew relatively little about its details and happened upon and suppressed material evidence. Were he so, we could fairly characterize him as "in the same position as . . . state law enforcement officials who, during a large scale investigation of the El Rukn gang, discovered—and then suppressed—evidence which could have exculpated [Fields]." *See Partee*, 978 F.2d at 367. As the original prosecutor, however, he was not fully divorced from Fields' judicial proceedings until all direct judicial remedies were exhausted and Fields' conviction became final. It follows that the immunity attendant to his prosecutorial disclosure obligation survives his departure from the courtroom as well.

The Supreme Court, in *Imbler*, identified the policy aims underlying absolute immunity, which support its

application in this situation. 424 U.S. at 427. It warned that subjecting prosecutors to financial liability could "dampen the prosecutor's exercise of his [prosecutorial] duty to bring to the attention of the court or of proper officials all significant evidence suggestive of innocence or mitigation." *Id.* at 427 n.25. While a prosecutor guilty of the fabrication with which Wharrie is accused might never be incentivized to reveal his violation—regardless of absolute immunity—we recognize this possibility as a cost outweighed by absolute immunity's effect on the "ultimate fairness of the operation of the [judicial] system [overall]." *Id.* at 427. Though a charged uncon-stitutional act, Wharrie's alleged suppression in this case was intimately associated with the judicial phase of the criminal process and is, therefore, immune from civil suit. *See id.* at 430.

### iv. Even If Wharrie Were Not Absolutely Immune as the Original Prosecutor on the Case, Fields Fails to State a Claim Against Him

Assuming arguendo that Wharrie did not act prosecutorially when he obtained Hawkins' testimony, Fields did not suffer a constitutional harm with respect to Hawkins' new, incriminating version of events until ASA Kelley introduced the testimony at retrial. In *Buckley v. Fitzsimmons* ("*Buckley IV*"), we distinguished between constitutional wrongs completed out of court and regrettable actions out of court that, by themselves, do not support recovery under Section 1983. 20 F.3d 789, 796 (1994). We explained that fabricating evidence,

including in the form of testimony, is not an actionable constitutional wrong.[4] *Id.* at 795-96. The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial—or when other information that impeach the testimony's reliability are not shared with the defense. *Id.* In this case, the constitutional violation occurred when, at retrial, the prosecution used Hawkins' testimony and never revealed to Fields that Wharrie had asked Hawkins to lie. *See id.* at 796 (citing *Mooney v. Holohan*, 294 U.S. 103, 112 (1935)).

Had Wharrie, after negotiating for Hawkins' false testimony, handled the retrial himself, his violation of Fields' due process rights would be absolutely immunized. *See id.* at 796-97 (citing *Jones v. Chicago*, 856 F.2d 985, 993-94 (7th Cir. 1988)). He would have been complicit in the fabrication of testimony during the "investigatory phase" of the retrial, but the constitutional injury would be the direct result of the absolutely immunized prosecutorial decision to proceed to trial and introduce the testimony. *See id.* As he did not do so, the critical question is whether ASA Kelley knew that the testimony was false when *he* proceeded to retry the case and introduced the testimony.

In *Buckley IV*, we noted that an actionable, out-of-court wrong exists against police officers who fabricate

---

[4] We also explained that inducing a witness's testimony by "promises to go easy" does not itself violate the Constitution. *Buckley IV,* 20 F.3d at 794.

evidence during the investigatory phase of a case and "bil[k]" a prosecutor into filing charges that he would not have filed but for that evidence. 20 F.3d at 796-97 (citing *Jones*, 856 F.2d at 993-94). The officers would receive only qualified immunity, though the prosecutor would be absolutely immune from suit. *Id.* We left open the question of whether this analysis applied to a prosecutor who handled the investigatory phase of a case and similarly deceived his successor into continuing prosecution. *Id.* at 797 n.2. Assuming, for the sake of argument, that we answer this question affirmatively, Wharrie would be subject to financial liability only if Kelley did not know that he had asked Hawkins to lie and would not have retried the case had he been aware of that information. *See id.*

Fields suggests, however, that Kelley knew Hawkins' testimony was false and retried the case regardless. Sumner recanted his identification in 1991, almost seven years before Kelley joined the prosecution team, and Kelley was aware that Hawkins' new story was a marked departure from the prosecution's original case. Although he does not explicitly state that Kelley knew that Wharrie asked Hawkins to lie, he strongly implies that he did. Therefore, the alleged constitutional harm occurred as Kelley exercised his prosecutorial duties at trial and resulted from his prosecutorial discretion regarding how to try his case. Fields has not, therefore, stated a claim against Wharrie based upon his soliciting Hawkins' false testimony.

### 2.  ASA Kelley

For the same reasons, Fields fails to state a claim against Kelley on the grounds that he solicited false testimony from Randy Langston before retrial. Fields contends that, prior to ever being assigned a role on the retrial team, Kelley "used coercive tactics to induce eyewitness Randy Langston to return back to the false testimony he had given at the first trial . . . ." He argues that because the act of solicitation occurred before Kelley was a prosecutor on the case, Kelley enjoys only qualified immunity for coercing the false testimony.

This analysis misses the point. Prior to the introduction of Langston's false testimony during retrial, Fields suffered no constitutional violation. The fact that the testimony was improperly coerced violated only Langston's constitutional rights. *See Buckley IV*, 20 F.3d at 794-95 ("Coercing witnesses to speak . . . is a genuine constitutional wrong, but the persons aggrieved would be [the person being interrogated] rather than [the defendant, if they are not the same].").

Kelley violated Fields' due process rights when he introduced the false testimony at trial and failed to reveal to him the coercion used to elicit it. *See id.* at 795-96. Had Kelley been unaware of the coerced nature of the testimony, Fields could sustain a claim against those parties that coerced the confession and "bilked" Kelley into retrying the case on its basis. *See id.* at 796-97 (citing *Jones*, 856 F.2d at 993-94). These are not the facts of this case, however. Kelley was aware of the coercion

applied: he was the one that applied it. Accordingly, Fields cannot maintain an independent claim against him for the coercion of the testimony independent of its use at retrial.[5] *See id.*

## B.   The District Court Enjoys Supplemental Jurisdiction

Wharrie and Kelley claim that the district court erred in retaining jurisdiction over Fields' state-law claims. Our recent decision in *Rodriguez v. Cook County, Illinois* makes clear that a state employee's sovereign-immunity defense does not impact a federal court's jurisdiction over a case. No. 11-1401, 2011 WL 6287910, at *3-4 (7th Cir. Dec. 15, 2011). Accordingly, we conclude that the district court has jurisdiction over the state-law claims.

Nevertheless, in light of our holding regarding Wharrie and Kelley's absolute immunity, the district court may

---

[5] Note that since Fields' retrial resulted in acquittal and a certificate of innocence, suppressing the coercion might not be a *Brady* violation at all because, counterintuitively, it was not material. *See United States v. Bagley*, 473 U.S. 667, 682 (1985) (citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984)) (explaining that evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different"); *see also Whitley*, 514 U.S. at 434 ("[T]he question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a . . . verdict worthy of confidence.").

wish to consider declining to exercise its supplemental jurisdiction. Without any remaining claims against Wharrie and Kelley under Section 1983, we suggest that the challenging state-law issues presented may more appropriately be resolved by the state court. *See RWJ Mgmt. Co., Inc. v. BP Prods. N. Am., Inc.*, No. 11-1268, 2012 WL 499043, at *2-3 (7th Cir. Feb. 16, 2012) (discussing the presumption in favor of relinquishing supplemental jurisdiction when no federal claims remain); *Al's Serv. Ctr. v. BP Prods. N. Am., Inc.*, 599 F.3d 720, 727 (7th Cir. 2010) (same). We, thus, remand to the district court to determine whether it wishes to (1) retain supplemental jurisdiction over Fields' state-law claims and determine the immunity, if any, to which Wharrie and Kelley are entitled under Illinois law, *see* 28 U.S.C. § 1367(c)(3) ("The district courts *may* decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original juris-diction . . . .") (emphasis added), or (2) dismiss the state-law claims without prejudice, *see Harvey v. Town of Merrillville*, 649 F.3d 526, 532-33 (7th Cir. 2011) ("[I]t is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supple-mental claims whenever all federal claims have been dismissed prior to trial." (quoting *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999))).

### III.  Conclusion

For the foregoing reasons, we REVERSE the district court's denial of absolute immunity and hold that

Wharrie and Kelley are immune from suit under Section 1983. With respect to the district court's jurisdiction over Fields' state-law claims, we REMAND this case to the district court for further proceedings consistent with this opinion.