SYKES, Circuit Judge,
concurring in part and dissenting in part.
I agree that Fields’s claims against Kelley are barred by absolute immunity. See Majority op. at 1114-16. In our earlier opinion in this case, we held that Wharrie is absolutely immune from suit on similar allegations of misconduct — specifically, that Wharrie coerced Earl Hawkins to falsely implicate Fields in the 1984 murders of Taiman Hickman and Jerome Smith during the interval between Fields’s first and second trials, while his postcon-viction proceedings were ongoing and in anticipation of retrial. See Fields v. Wharrie (“Fields I”), 672 F.3d 505, 511-16 (7th Cir.2012). The allegations against Kelley are materially indistinguishable from the allegations against Wharrie stemming from this time period. The only difference is that Kelley is accused of inducing another witness, Randy Langston, to make a false identification of Fields. But this act, like Wharrie’s alleged coercion of Hawkins, took place during the judicial phase of the criminal process and was functionally prosecutorial. So Kelley, like Wharrie, is absolutely immune from suit for this conduct. See Van de Kamp v. Goldstein, 555 U.S. 335, 340-45, 129 S.Ct. 855, 172 L.Ed.2d 706 (2009); Imbler v. Pachtman, 424 U.S. 409, 430-31, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976); Fields I, 672 F.3d at 510-15.
Illinois apparently follows the federal law on absolute immunity, see Frank v. Garnati, 370 Ill.Dec. 931, 934, 989 N.E.2d 319 (Ill.App.Ct.2013); White v. City of Chicago, 369 Ill.App.3d 765, 308 Ill.Dec. 518, 861 N.E.2d 1083, 1088-94 (2006); the parties do not argue otherwise. Accordingly, I join the majority opinion to the extent that it reverses the district court’s order permitting the state-law claims against Kelley to proceed. See Majority op. at 1114-16.
Unlike my colleagues, however, I would also reverse the district court’s decision to reinstate the § 1983 and state-law claims against Wharrie for his conduct in 1985, before Fields was charged. Fields alleges that during the investigation of the Hickman and Smith murders, Wharrie coerced Anthony Sumner, a fellow gang member, to falsely implicate him in the crimes. Fields I, 672 F.3d at 508-09. As we explained in our earlier opinion, Fields was convicted of killing Hickman and Smith based in part on Sumner’s testimony, but he won a new trial for unrelated reasons (the trial judge had been bribed), was acquitted on retrial, and obtained a certificate of innocence.[1] Id. at 509. His com *1117 plaint seeks damages under 42 U.S.C. § 1983 for violation of his right to due process; he also asserts several state-law theories of liability for the wrongful convictions.[2]
To the extent that the § 1983 and state-law claims against Wharrie are based on his alleged coercion of the false statement from Sumner, absolute immunity does not apply. That act took place before there was probable cause to arrest Fields — that is, before the judicial process began — and was not functionally prosecutorial, so Wharrie cannot claim to be absolutely immune from suit for damages. Buckley v. Fitzsimmons, 509 U.S. 259, 273-76, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993); Buckley v. Fitzsimmons, 20 F.3d 789, 794 (7th Cir.1994).
But Wharrie remains protected by qualified immunity, see Buckley, 509 U.S. at 275-76, 113 S.Ct. 2606, which “is available unless the acts violated ‘clearly established’ constitutional norms,” Buckley, 20 F.3d at 794. The Supreme Court’s decision in Buckley addressed only absolute prosecutorial immunity; the Court did not have occasion to decide the qualified-immunity question. That is, the Court did not decide whether coercing or otherwise inducing a witness to give a false statement during a criminal investigation violates clearly established constitutional rights. But we decided that very question when the Supreme Court returned Buckley to this court for further proceedings.
In our decision on remand in Buckley, we held that coercing or otherwise soliciting a witness to falsely incriminate a suspect during a criminal investigation does not violate any established constitutional rights — except perhaps the rights of the witness who is coerced. Id. at 794-97. If the suspect is charged, then failing to disclose the false statement’s corrupt origins at trial violates his due-process right to a fair trial under the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and knowingly using perjured testimony to convict him is a more general violation of his due-process right to a fair trial. See Buckley, 20 F.3d at 794-95; see also Albright v. Oliver, 510 U.S. 266, 273 n. 6, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (plurality opinion); Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Mooney v. Holohan, 294 U.S. 103, 112, 55 S.Ct. 340, 79 L.Ed. 791 (1935); Serino v. Hensley, 735 F.3d 588, 592 (7th Cir.2013); Newsome v. McCabe, 256 F.3d 747, 750-52 (7th Cir. 2001). But a prosecutor who commits these acts or omissions at trial is functioning quintessentially as a prosecutor, so under well-established immunity law, he is absolutely immune from suit for damages under § 1983. Van de Kamp, 555 U.S. at 340-45, 129 S.Ct. 855; Imbler, 424 U.S. at 430-31, 96 S.Ct. 984; Fields I, 672 F.3d at 510-15; Buckley, 20 F.3d at 794-96.
In contrast, a prosecutor who coerces or otherwise procures a false statement from a witness during an investigation, before probable cause exists and the judicial process has begun, is not protected by absolute immunity, but he is entitled to qualified immunity because his conduct does not violate clearly established constitutional rights. Buckley, 20 F.3d at 794-98. Due-process rights are not implicated at *1118 this stage; they arise later, when judicial proceedings are instituted. Id. Accordingly, extracting a false statement from a witness during a criminal investigation is not independently actionable as a constitutional violation, and Buckley holds that “events not themselves supporting recovery [against prosecutors] under § 1983 do not become actionable because they lead to injurious acts for which [the prosecutors] possess absolute immunity.” Id. at 796.
In our earlier opinion in this case, we relied on this qualified-immunity holding from Buckley as an alternative basis for finding Wharrie and Kelley immune from suit under § 1983 for their solicitation of false statements from Hawkins and Lang-ston. Fields I, 672 F.3d at 516-18. Citing Buckley, we noted that “fabricating evidence, including in the form of testimony, is not an actionable constitutional wrong.... The constitutional violation occurs when the means by which the testimony was acquired are not disclosed at trial — or when other information that impeach[es] the testimony’s reliability is not shared with the defense.” Id. at 516-17. Our alternative holding in Fields I followed the rule, established in Buckley, that even if a prosecutor participates in securing a false statement from a witness during a criminal investigation, his “absolutely immunized prosecutorial decision to proceed to trial and introduce the [witness’s] testimony” forecloses suit against him; there is no independently cognizable due-process claim for his investigative misconduct.[3] Id. at 517 (discussing Wharrie’s qualified immunity); see also id. at 51718 (discussing Kelley’s qualified immunity).
Three months after we issued our opinion in Fields I, a new decision of this court, Whitlock v. Brueggemann, 682 F.3d 567 (7th Cir.2012), unsettled Buckley (and by extension, unsettled Fields I as well), which led the district court to do an about-face on remand in this case. Wharrie’s new appeal requires us to decide whether Whitlock and Buckley can be reconciled. I think the answer is plainly “no.”
As my colleagues have noted, Whitlock drew a distinction, for qualified-immunity purposes, between a prosecutor who coer-cively interrogates witnesses and a prosecutor who fabricates evidence. See Majority op. at 1112-13. Whitlock observed that coercion and unsavory tactics like paying for testimony and witness shopping “may be deplorable, and ... may contribute to wrongful convictions, but they do not necessarily add up to a constitutional violation even when their fruits are introduced at trial ... [because] [e]vi-dence collected with these kinds of suspect techniques, unlike falsified evidence and perjured testimony, may turn out to be true.” 682 F.3d at 584. This proposed distinction between “coerced” and “fabricated” evidence was the linchpin for distinguishing Buckley and permitting the claim against the prosecutor in Whitlock to proceed. The Whitlock panel thought the prosecutors in Buckley had been accused of coercing witnesses and using other suspect tactics but were not alleged to have fabricated evidence, and on that basis distinguished the case. Id. at 584-85.
Regrettably, that was a mistake. In fact, both Buckley and Whitlock involved allegations that prosecutors had coerced, cajoled, paid for, or otherwise solicited falsified statements from witnesses — in other words, they fabricated evidence. Indeed, Buckley repeatedly refers to allegations that prosecutors coercively obtained “false *1119 inculpatory statements” from witnesses and “fabricated” or “manufactured” testimony and evidence from an expert.[4] 20 F.3d at 794-95. So regardless of whether Whitlock’s proposed distinction between “coerced” and “fabricated” witness statements is valid in theory — and makes a difference in the constitutional analysis — it simply was not present as a factual matter and therefore cannot provide a basis on which to distinguish Buckley from Whit-lock,[5]
Yet my colleagues perpetuate the distinction here. See Majority Op. at 1109-10, 1112-13. I appreciate the force of stare decisis; we should try to harmonize the two cases if we can. With respect, however, harmonization is impossible. Whitlock and Buckley are factually indistinguishable and legally irreconcilable. They cannot both be the law. We must decide which one is correct.[6]
*1120 For my part, I think Buckley is correct and Whitlock should be reconsidered. Because mine is the minority view here, any reconsideration of Whitlock must await a petition for rehearing en banc, which Wharrie may choose to pursue or forego. For the record, I’ll briefly sketch the conceptual difficulty Whitlock has introduced, which I believe warrants the full court’s attention.
I have already described Buckley’s qualified-immunity holding, which was and remains sound. Whitlock rejected qualified immunity for a similarly situated prosecutor by using common-law causation principles to find an actionable constitutional violation where one did not otherwise exist. I do not agree with this development in our circuit’s law.
As I’ve explained, Buckley contains two important principles of immunity law that apply in suits alleging prosecutorial misconduct: (1) a prosecutor’s use of fabricated evidence at trial may be actionable as a violation of the defendant’s right to due process — under the rubric of Brady or perhaps more generally as a violation of the right to a fair trial — but the prosecutor is absolutely immune from suit under Imbler and related cases, see 20 F.3d at 794-95; and (2) a prosecutor’s fabrication of evidence against a suspect during an investigation is covered by qualified immunity because it doesn’t violate clearly established constitutional rights, see id. at 794-98. Whitlock’s innovation is to use common-law causation analysis to eliminate the effect of both forms of immunity. The panel held that “[t]he actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation.”[7] Whitlock, 682 F.3d at 583.
As applied to a prosecutor, this reasoning circumvents both qualified and absolute immunity. Both immunities are well established and important. See Van de Kamp, 555 U.S. at 341-43, 129 S.Ct. 855 (absolute immunity); Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982) (qualified immunity); Imbler, 424 U.S. at 424-26, 96 S.Ct. 984 (absolute immunity). Absolute immunity can sometimes produce harsh results, but it has long been thought necessary to encourage and protect the vigorous performance of the prosecutorial function. See Van de Kamp, 555 U.S. at 341-43, 129 *1121 S.Ct. 855; Imbler, 424 U.S. at 424-26, 96 S.Ct. 984.
In a shorthand version, the rule announced in Whitlock is basically this: A prosecutor who falsifies evidence during an investigation violates no clearly established constitutional rights and thus has qualified immunity from suit (see Buckley), but his conduct is nonetheless actionable as a non-immune subsidiary .“cause” (both but-for and proximate) of a due-process violation that occurs later, when the prosecutor introduces the falsified evidence at trial— even though the prosecutor is absolutely immune from suit for the due-process violation. In other words, the only conduct that can possibly form the basis of a constitutional claim — the prosecutor’s trial conduct — is fully protected by absolute immunity, but the prosecutor can be sued anyway, based on the causal link between his nonactionable investigative conduct and his immunized trial conduct.
Aside from destabilizing immunity law, this chain of reasoning overlooks some basic differences between common-law and constitutional torts. Common-law causation rules flow from the nature of duty and breach in tort law. Everyone has a general tort duty to refrain from doing an act or omitting a precaution that creates a foreseeable, unreasonable risk of harm to other persons or property. See generally Restatement (Second) of Torts § 282 (1965) (defining negligence). The duty is broad and undifferentiated and is owed to everyone at all times, and anyone who breaches it is liable for harms factually and proximately caused.
Constitutional rights — and the corresponding duties imposed on governmental actors — are not like the generalized rights and duties imposed by negligence law. They are implicated at specific times and in specific circumstances. As relevant here, Fields’s due-process rights came into play after he was charged; the Brady disclosure duty is an aspect of the right to a fair trial, as is the broader right not to have the trial process subverted by the knowing introduction of falsified evidence. See Serino, 735 F.3d at 592; Newsome, 256 F.3d at 751-52; Buckley, 20 F.3d at 796-97. So Wharrie’s act of extracting a false statement from Sumner during the investigative phase of the case did not violate Fields’s due-process rights. A prosecutor who commits this kind of misconduct has behaved deplorably but has breached no constitutional duty and thus committed no constitutional wrong.
Common-law causation analysis cannot be used to transform an act that does not violate the Constitution into one that does. That, in essence, is the effect of Whitlock. It turns the prosecutor’s nonactionable investigative misconduct into an actionable constitutional wrong by recharacterizing it as a subsidiary “cause” of a due-process violation that occurs later at trial but is absolutely immunized.
To help explain and justify Whitlock, my colleagues analogize to product-liability causation rules. See Majority op. at 1111— 12. I think the analogy exposes a key conceptual problem in the analysis. The pipe maker who negligently manufactures a pipe breaches his general tort duty to refrain from acts that create an unreasonable risk of harm to persons or property. The breach may not cause harm until the pipe bursts, and the statute of limitations does not begin to run until the harm occurs. But the breach of duty occurs at the point of negligent manufacture, and the manufacturer will be liable for harm that flows causally from that breach. (In the law of strict product liability, the manufacturer’s sale of the defective pipe starts the causal chain, but the basic point about the order of analysis — duty/breach/cause—remains the same.)
*1122 Section 1983 does not impose an analogous generalized duty on governmental agents to refrain from putting people at an unreasonable risk of harm. Rather, § 1983 creates a cause of action for damages against state and local officials who inflict specific deprivations of federal rights. See 42 U.S.C. § 1983 (creating a cause of action against any official who, under color of state law, “subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws”). It is well understood that § 1983 “ ‘is not itself a source of substantive rights,’ but merely provides ‘a method for vindicating federal rights elsewhere conferred.’ ” Albright, 510 U.S. 266, 114 S.Ct. at 811 (plurality opinion) (quoting Baker v. McCollan, 443 U.S. 137, 144 n. 3, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979)). In other words, the Constitution supplies the rights and duties and otherwise fills in the content of a § 1983 claim. So “[t]he first step in any such claim is to identify the specific constitutional right allegedly infringed.” Id.
Here, the right allegedly infringed is the due-process right to a fair trial, but under the rationale of Whitlock, the asserted act of infringement occurred before any fair-trial duty arose. To put the problem colloquially, Whitlock puts the causation cart before the duty horse. A prosecutor who coerces a witness to falsely incriminate a suspect during a criminal investigation breaches no constitutional duty owed to the suspect. If the suspect is charged, then suborning perjury against him at trial would violate his due-process rights — so too would withholding evidence about the coercion of the witness. But these are trial rights, and a prosecutor’s violation of them is absolutely immunized. The prosecutor’s investigative misconduct cannot independently support a due-process claim; that conduct violates no due-process duty.
It is true, as my colleagues have noted, that the Supreme Court said the following in Buckley:
A prosecutor may not shield his investigative work with the aegis of absolute immunity merely because, after a suspect is eventually arrested, indicted, and tried, that work may be retrospectively described as ‘preparation’ for a possible trial; every prosecutor might then shield himself from liability for any constitutional wrong against innocent citizens by ensuring that they go to trial.
Buckley, 509 U.S. at 276, 113 S.Ct. 2606. This passage in the Court’s opinion simply drives home the point that prosecutors are not protected by absolute immunity for their pre-charging misconduct. That much is clear from the very next sentence: “When the functions of prosecutors and detectives are the same, as they were here, the immunity that protects them is also the same.” Id. That’s an obvious reference to qualified immunity.
It’s worth repeating that the Court sent Buckley back to us to decide the qualified-immunity question. We unambiguously held — in 1991 — that falsifying evidence during an investigation does not violate established constitutional rights, and “events not themselves supporting recovery [against prosecutors] under § 1983 do not become actionable because they lead to injurious acts for which [the prosecutors] possess absolute immunity.” Buckley, 20 F.3d at 796.
Directly contradicting that clear holding of Buckley, my colleagues now conclude that “it was established law by 1985, when the fabrication is alleged to have occurred, that a government lawyer’s fabricating evidence against a criminal defendant was a violation of due process.” Majority op. at 1114 (emphasis added). For this proposi *1123 tion they cite Napue v. Illinois, 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959); Pyle v. Kansas, 317 U.S. 213, 63 S.Ct. 177, 87 L.Ed. 214 (1942); and Mooney v. Holohan, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), but these cases do not hold that fabricating evidence violates due process. Rather, they hold that the use of falsified evidence or perjured testimony at trial violates the defendant’s due-process right to a fair trial and is grounds for habeas or other postconviction relief. See Napue, 360 U.S. at 269, 79 S.Ct. 1173; Pyle, 317 U.S. at 215-16, 63 S.Ct. 177; Mooney, 294 U.S. at 112-13, 55 S.Ct. 340. As my colleagues have noted, the qualified-immunity inquiry asks whether a reasonable public official could be expected to know that the conduct in question violates constitutional rights. See Majority op. at 1114 (citing Harlow, 457 U.S. at 819, 102 S.Ct. 2727). The specific conduct in question here— inducing a witness to tell a lie during an investigation — is clearly wrong, but it does not violate any constitutional rights.
So although my colleagues have formally left Buckley in place, the core of the opinion — its qualified-immunity holding — is effectively overruled.
Finally, a brief comment on my colleagues’ assertion that adhering to Buckley would work a “breathtaking injustice” and produce “an offensive and indeed senseless result.”[8] Id. at 1113, 1113. These are strong words. No one doubts that wrongful convictions are unjust; a person who is convicted and punished for a crime he did not commit has a serious moral claim to a compensatory remedy. Usually the law provides one, commonly in the form of a Brady claim against the officers who were involved in suppressing exculpatory evidence during the prosecution. It’s possible that in some cases the effect of absolute immunity — or the combined effect of absolute and qualified immunity — might leave a wrongly convicted person without an actionable damages claim against any of the wrongdoers. I could be wrong, but I don’t think that happens very often. Prosecutors do not work alone, and if the police officers working with them withhold exculpatory information about coerced or fabricated evidence, the aggrieved defendant will have a good § 1983 claim against the officers for violation of Brady. The Brady duty is well established, and the claim against the officers is available regardless of whether the prosecutor participated in the “creation” of the fabricated evidence or the cover-up at trial or both. That basically describes this case.[9]
My colleagues also perceive a need to authorize a damages remedy as a deterrent against rogue prosecutors. Id. at 1113-14. That’s a valid concern, but it doesn’t justify finding a cognizable constitutional violation where one does not exist. The policy justification for absolute immu *1124 nity accepts that deterrence can be achieved in other ways. Although a complicit prosecutor escapes civil liability for damages, he remains subject to criminal prosecution and professional discipline for his misdeeds; he is not immune from these consequences for his misconduct. See Imbler, 424 U.S. at 429, 96 S.Ct. 984. The prospect of criminal liability and disbarment are powerful deterrents. See id. (“These [criminal and professional] checks undermine the argument that the imposition of civil liability is the only way to insure that prosecutors are mindful of the constitutional rights of persons accused of crime.”).
In the end, the policy behind absolute prosecutorial immunity “reflects ‘a balance’ of ‘evils’ ” based on a judgment that it is “ ‘better ... to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation.’ ” Van de Kamp, 555 U.S. at 340, 129 S.Ct. 855 (quoting Gregoire v. Biddle, 177 F.2d 579, 581 (2d Cir.1949) (Hand, J.)). Moreover, as we said in Buckley, “[qualified immunity does not permit us to recognize ... [new constitutional] right[s] in this litigation.” Buckley, 20 F.3d at 797. Although Wharrie’s alleged wrongdoing may go un-redressed via a federal damages remedy against him, Fields has an ongoing § 1983 claim against the police officers who were allegedly complicit in withholding exculpatory evidence about the circumstances surrounding Sumner’s false statement.
In sum, applying Buckley requires a conclusion that Wharrie is entitled to qualified immunity for his investigative misconduct; his act of soliciting Sumner’s false statement did not violate clearly established constitutional rights and does “not become actionable because [it led to] injurious acts for which [the prosecutor] possesses] absolute immunity.” Id. at 796. Applying Whitlock, my colleagues conclude that Wharrie’s investigative misconduct is actionable as a non-immune subsidiary “cause” of his absolutely immunized due-process violation at trial. I would reconsider Whitlock, restore Buckley, and reverse with instructions to dismiss the § 1983 claim against Wharrie. With no federal claim remaining, the district court ordinarily should relinquish jurisdiction over the state-law claims against him. See Fields I, 672 F.3d at 518-19.
For the foregoing reasons, I respectfully concur in part and dissent in part.

. Sumner recanted his testimony after Fields’s first trial. See Fields v. Wharrie ("Fields I"), 672 F.3d 505, 517 (7th Cir. 2012). The status of Fields’s certificate of *1117 innocence is in flux. The Illinois Appellate Court reversed the circuit court's issuance of it, see People v. Fields, 355 Ill.Dec. 429, 959 N.E.2d 1162, 1163 (App.Ct.2011), and as far as I can tell, proceedings on remand remain pending in Cook County Circuit Court.

. Fields sued several Chicago police officers in addition to the two prosecutors, but this interlocutory appeal, like the earlier one, concerns only the prosecutors’ claims of absolute and qualified immunity.

. There might be an actionable Fourth Amendment claim for false arrest, but Fields has not made that claim here.

.More specifically, Stephen Buckley alleged that prosecutors coerced two witnesses to falsely implicate him during a murder investigation. See Buckley v. Fitzsimmons, 20 F.3d 789, 794-96 (7th Cir. 1994). He also alleged that the prosecutors paid an expert witness for forensic evidence — a bootprint identification — that they knew was false. Id. at 795-96. The prosecutors indicted and tried Buckley for murder; the jury deadlocked, and while Buckley was awaiting retrial, someone else confessed to the crime. See Buckley v. Fitzsimmons, 509 U.S. 259, 264, 113 S.Ct. 2606, 125 L.Ed.2d 209 (1993). We held that the prosecutors were entitled to qualified immunity for their pre-charging misconduct because the solicitation of false evidence — by whatever device (whether coercion or payment) — does not violate clearly established constitutional rights; the use of the false evidence at trial may have violated Buckley’s due-process right to a fair trial, but the prosecutors were absolutely immune for that misconduct. Buckley, 20 F.3d at 794-97.
The facts of Whitlock were materially identical. There, the plaintiffs alleged that a witness had been coerced to give a false statement implicating them in a double murder and that another witness falsely incriminated them after being plied with money and alcohol. See Whitlock v. Brueggemann, 682 F.3d 567, 572 (7th Cir.2012). They were convicted based in part on the false testimony of these witnesses, and after their convictions were overturned (based on Brady violations), they sued the police officers and the prosecutor who were involved in the investigation and prosecution. As I have noted, in rejecting the prosecutor’s claim of qualified immunity, the Whitlock panel distinguished Buckley by drawing a distinction between coerced and fabricated evidence, apparently overlooking the fact that both cases involved allegations of coercion and fabrication.

. Judge Kennelly, who is handling this case in the trial court, saw the problem immediately. Although he followed Whitlock because it is the later-decided case, he pointedly noted that ‘‘[bjoth the defendants in Whitlock and the defendants in Buckley [] were alleged to have coerced false inculpatory statements from witnesses.... Thus there is no apparent factual distinction between the underlying fabri-catory conduct in Whitlock and that in Buckley [].” Fields v. City of Chicago, No. 10 C 1168, 2012 WL 6705790, at *5 (N.D.Ill. Dec. 26, 2012).

. My colleagues have acknowledged that both Whitlock and Buckley involved prosecutors who were alleged to have fabricated evidence during an investigation. See Majority op. at 1112-13. They maintain that the cases can still be distinguished because “the focus [in Buckley] was on coercion, and the primary victims, and only victims held to have standing to sue, were the coerced witnesses.” Id. at 1113. They read Whitlock as holding that Buckley’s " 'tough luck’ rule doesn't apply when there is no coerced witness but nevertheless fabricated evidence; the evidence might be given by a paid police informant — a compensated witness, not a coerced one.” Id. at 1113.
There are several problems with this analysis. First, our decision in Buckley had nothing to do with the standing of the coerced witnesses; we mentioned this point only to explain that although the witnesses might have a claim for violation of their constitutional rights during the investigation, Buckley — the only plaintiff in the case — did not. See Buckley, 20 F.3d at 794-97. Second, in *1120 straining to maintain Whitlock's distinction between coerced and fabricated evidence, my colleagues continue to disregard the material factual identity between Buckley and Whit-lock — both cases involved allegations of pre-charging fabrication of evidence, some of which was allegedly coerced. See supra n. 4. Finally, my colleagues do not explain the constitutional basis for the coercion/fabrication distinction. It’s not clear why it makes a difference in the qualified-immunity analysis, which asks whether the pre-charging misconduct violates established constitutional rights.

. Although it's not entirely clear, the due-process violation to which Whitlock refers can only be a violation of the procedural right to a fair trial. That much is implicit in the context of the case and the content of the opinion, which does not address the more complicated and unsettled question whether the Due Process Clause provides a substantive ground of protection against malicious prosecution. See Albright v. Oliver, 510 U.S. 266, 271-74, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) ("Where a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of 'substantive due process,' must be the guide for analyzing these claims.” (plurality opinion) (internal quotation marks omitted)); see also id. at 275-76, 114 S.Ct. 807 (Scalia, J., concurring); id. at 283-86, 114 S.Ct. 807 (Kennedy, J., concurring); Serino v. Hensley, 735 F.3d 588, 592-94 (7th Cir.2013); Julian v. Hanna, 732 F.3d 842, 845-48 (7th Cir.2013); Newsome v. McCabe, 256 F.3d 747, 750-53 (7th Cir.2001).

. Actually they refer to the “breathtaking injustice” of accepting Wharrie's "conception” of Buckley, Majority op. at 1113, but the real objection seems to be with Buckley itself.

. Moreover, the wrongly convicted need not worry that officers who violate Brady will be judgment proof because Illinois requires municipalities to indemnify their police officers. See 745 III. Comp. Stat. 10/9-102 ("A local public entity is empowered and directed to pay any tort judgment or settlement for compensatory damages ... for which it or an employee while acting within the scope of his employment is liable....”). People who are wrongly convicted in Illinois can also seek a certificate of innocence, entitling them to a monetary award from the Illinois Court of Claims of up to $199,150. See 705 III. Comp. Stat. 505/8(c). Fields initially obtained a certificate of innocence, and a compensation check was issued to him by the Court of Claims, but the Illinois Appellate Court reversed and remanded. See People v. Fields, 959 N.E.2d at 1163-66.