(Slip Opinion)        OCTOBER TERM, 2008        1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## VAN DE KAMP ET AL. *v.* GOLDSTEIN

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 07–854.   Argued November 5, 2008—Decided January 26, 2009

Respondent Goldstein was released from a California prison after he filed a successful federal habeas petition alleging that his murder conviction depended, in critical part, on the false testimony of a jailhouse informant (Fink), who had received reduced sentences for providing prosecutors with favorable testimony in other cases; that prosecutors knew, but failed to give his attorney, this potential impeachment information; and that, among other things, that failure had led to his erroneous conviction.  Once released, Goldstein filed this suit under 42 U. S. C. §1983, asserting the prosecution violated its constitutional duty to communicate impeachment information, see *Giglio* v. *United States*, 405 U. S. 150, 154, due to the failure of petitioners, supervisory prosecutors, to properly train or supervise prosecutors or to establish an information system containing potential impeachment material about informants.  Claiming absolute immunity, petitioners asked the District Court to dismiss the complaint, but the court declined, finding that the conduct was "administrative," not "prosecutorial," and hence fell outside the scope of an absolute immunity claim.  The Ninth Circuit, on interlocutory appeal, affirmed.

*Held:* Petitioners are entitled to absolute immunity in respect to Goldstein's supervision, training, and information-system management claims.  Pp. 3–12.

  (a) Prosecutors are absolutely immune from liability in §1983 suits brought against prosecutorial actions that are "intimately associated with the judicial phase of the criminal process," *Imbler* v. *Pachtman*, 424 U. S. 409, 428, 430, because of "concern that harassment by unfounded litigation" could both "cause a deflection of the prosecutor's energies from his public duties" and lead him to "shade his decisions instead of exercising the independence of judgment required by his

public trust," *id.*, at 423. However, absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in, say, investigative or administrative tasks. *Id.*, at 431, n. 33. To decide whether absolute immunity attaches to a particular prosecutorial activity, one must take account of *Imbler*'s "functional" considerations. The fact that one constitutional duty in *Imbler* was positive (the duty to supply "information relevant to the defense") rather than negative (the duty not to "use . . . perjured testimony") was not critical to the finding of absolute immunity. Pp. 3–6.

(b) Although Goldstein challenges administrative procedures, they are procedures that are directly connected with a trial's conduct. A prosecutor's error in a specific criminal trial constitutes an essential element of the plaintiff's claim. The obligations here are thus unlike administrative duties concerning, *e.g.,* workplace hiring. Moreover, they necessarily require legal knowledge and the exercise of related discretion, *e.g.*, in determining what information should be included in training, supervision, or information-system management. Given these features, absolute immunity must follow. Pp. 6–12.

(1) Had Goldstein brought a suit directly attacking supervisory prosecutors' actions related to an individual trial, instead of one involving administration, all the prosecutors would have enjoyed absolute immunity under *Imbler*. Their behavior, individually or separately, would have involved "[p]reparation . . . for . . . trial," 424 U. S., at 431, n. 33, and would have been "intimately associated with the judicial phase of the criminal process," *id.,* at 430. The only difference between *Imbler* and the hypothetical, *i.e.,* that a supervisor or colleague might be liable *instead of* the trial prosecutor, is not critical. Pp. 7–8.

(2) Just as supervisory prosecutors are immune in a suit directly attacking their actions in an individual trial, they are immune here. The fact that the office's *general* supervision and training methods are at issue is not a critical difference for present purposes. The relevant management tasks concern how and when to make impeachment information available at trial, and, thus, are directly connected with a prosecutor's basic trial advocacy duties. In terms of *Imbler*'s functional concerns, a suit claiming that a supervisor made a mistake directly related to a particular trial and one claiming that a supervisor trained and supervised inadequately seem very much alike. The type of "faulty training" claim here rests in part on a consequent error by an individual prosecutor in the midst of trial. If, as *Imbler* says, the threat of damages liability for such an error could lead a trial prosecutor to take account of that risk when making trial-related decisions, so, too, could the threat of more widespread liabil-

ity throughout the office lead both that prosecutor and other office prosecutors to take account of such a risk. Because better training or supervision might prevent most prosecutorial errors at trial, permission to bring suit here would grant criminal defendants permission to bring claims for other trial-related training or supervisory failings. Further, such suits could "pose substantial danger of liability even to the honest prosecutor." *Imbler*, 425 U. S., at 425. And defending prosecutorial decisions, often years later, could impose "unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.*, at 425–426. Permitting this suit to go forward would also create practical anomalies. A trial prosecutor would remain immune for intentional misconduct, while her supervisor might be liable for negligent training or supervision. And the ease with which a plaintiff could restyle a complaint charging trial failure to one charging a training or supervision failure would eviscerate *Imbler*. Pp. 8–11.

(3) The differences between an information management system and training or supervision do not require a different outcome, for the critical element of any information system is the information it contains. Deciding what to include and what not to include is little different from making similar decisions regarding training, for it requires knowledge of the law. Moreover, were this claim allowed, a court would have to review the office's legal judgments, not simply about *whether* to have an information system but also about *what kind* of system is appropriate, and whether an appropriate system would have included *Giglio*-related information *about one particular kind of informant.* Such decisions—whether made before or during trial—are "intimately associated with the judicial phase of the criminal process," *Imbler*, *supra,* at 430, and all *Imbler*'s functional considerations apply. Pp. 11–12.

481 F. 3d 1170, reversed and remanded.

BREYER, J., delivered the opinion for a unanimous Court.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 07–854

JOHN VAN DE KAMP, ET AL., PETITIONERS *v.*
THOMAS LEE GOLDSTEIN

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[January 26, 2009]

JUSTICE BREYER delivered the opinion of the Court.

We here consider the scope of a prosecutor's absolute immunity from claims asserted under Rev. Stat. §1979, 42 U. S. C. §1983. See *Imbler* v. *Pachtman*, 424 U. S. 409 (1976). We ask whether that immunity extends to claims that the prosecution failed to disclose impeachment material, see *Giglio* v. *United States*, 405 U. S. 150 (1972), due to: (1) a failure properly to train prosecutors, (2) a failure properly to supervise prosecutors, or (3) a failure to establish an information system containing potential impeachment material about informants. We conclude that a prosecutor's absolute immunity extends to all these claims.

I

In 1998, respondent Thomas Goldstein (then a prisoner) filed a habeas corpus action in the Federal District Court for the Central District of California. He claimed that in 1980 he was convicted of murder; that his conviction depended in critical part upon the testimony of Edward Floyd Fink, a jailhouse informant; that Fink's testimony was unreliable, indeed false; that Fink had previously

received reduced sentences for providing prosecutors with favorable testimony in other cases; that at least some prosecutors in the Los Angeles County District Attorney's Office knew about the favorable treatment; that the office had not provided Goldstein's attorney with that information; and that, among other things, the prosecution's failure to provide Goldstein's attorney with this potential impeachment information had led to his erroneous conviction. *Goldstein* v. *Long Beach*, 481 F. 3d 1170, 1171–1172 (CA9 2007).

After an evidentiary hearing the District Court agreed with Goldstein that Fink had not been truthful and that if the prosecution had told Goldstein's lawyer that Fink had received prior rewards in return for favorable testimony it might have made a difference. The court ordered the State either to grant Goldstein a new trial or to release him. The Court of Appeals affirmed the District Court's determination. And the State decided that, rather than retry Goldstein (who had already served 24 years of his sentence), it would release him. App. 54–55, 59–60.

Upon his release Goldstein filed this §1983 action against petitioners, the former Los Angeles County district attorney and chief deputy district attorney. Goldstein's complaint (which for present purposes we take as accurate) asserts in relevant part that the prosecution's failure to communicate to his attorney the facts about Fink's earlier testimony-related rewards violated the prosecution's constitutional duty to "insure communication of all relevant information on each case [including agreements made with informants] to every lawyer who deals with it." *Giglio*, *supra,* at 154. Moreover, it alleges that this failure resulted from the failure of petitioners (the office's chief supervisory attorneys) adequately to train and to supervise the prosecutors who worked for them as well as their failure to establish an information system about informants. And it asks for damages based upon

these training, supervision, and information-system related failings.

Petitioners, claiming absolute immunity from such a §1983 action, asked the District Court to dismiss the complaint. See *Imbler, supra.* The District Court denied the motion to dismiss on the ground that the conduct asserted amounted to "administrative," not "prosecutorial," conduct; hence it fell outside the scope of the prosecutor's absolute immunity to §1983 claims. The Ninth Circuit, considering petitioners' claim on an interlocutory appeal, affirmed the District Court's "no immunity" determination. We now review the Ninth Circuit's decision, and we reverse its determination.

## II

A half-century ago Chief Judge Learned Hand explained that a prosecutor's absolute immunity reflects "a balance" of "evils." *Gregoire* v. *Biddle*, 177 F. 2d 579, 581 (CA2 1949). "[I]t has been thought in the end better," he said, "to leave unredressed the wrongs done by dishonest officers than to subject those who try to do their duty to the constant dread of retaliation." *Ibid.* In *Imbler, supra*, this Court considered prosecutorial actions that are "intimately associated with the judicial phase of the criminal process." *Id.*, at 430. And, referring to Chief Judge Hand's views, it held that prosecutors are absolutely immune from liability in §1983 lawsuits brought under such circumstances. *Id.*, at 428.

The §1983 action at issue was that of a prisoner freed on a writ of habeas corpus who subsequently sought damages from his former prosecutor. His action, like the action now before us, tracked the claims that a federal court had found valid when granting his habeas corpus petition. In particular, the prisoner claimed that the trial prosecutor had permitted a fingerprint expert to give false testimony, that the prosecutor was responsible for the expert's having

suppressed important evidence, and that the prosecutor had introduced a misleading artist's sketch into evidence. *Id.*, at 416.

In concluding that the prosecutor was absolutely immune, the Court pointed out that legislators have long "enjoyed absolute immunity for their official actions," *id.*, at 417; that the common law granted immunity to "judges and . . . jurors acting within the scope of their duties," *id.*, at 423, and that the law had also granted prosecutors absolute immunity from common-law tort actions, say, those underlying a "decision to initiate a prosecution," *id.*, at 421. The Court then held that the "same considerations of public policy that underlie" a prosecutor's common-law immunity "countenance absolute immunity under §1983." *Id.*, at 424. Those considerations, the Court said, arise out of the general common-law "concern that harassment by unfounded litigation" could both "cause a deflection of the prosecutor's energies from his public duties" and also lead the prosecutor to "shade his decisions instead of exercising the independence of judgment required by his public trust." *Id.*, at 423.

Where §1983 actions are at issue, the Court said, both sets of concerns are present and serious. The "public trust of the prosecutor's office would suffer" were the prosecutor to have in mind his "own potential" damages "liability" when making prosecutorial decisions—as he might well were he subject to §1983 liability. *Id.*, at 424. This is no small concern, given the frequency with which criminal defendants bring such suits, *id.*, at 425 ("[A] defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate"), and the "substantial danger of liability even to the honest prosecutor" that such suits pose when they survive pretrial dismissal, *ibid.;* see also *ibid.* (complex, close, fair-trial questions "often would require a virtual retrial of the criminal offense in a new

forum, and the resolution of some technical issues by the lay jury"). A "prosecutor," the Court noted, "inevitably makes many decisions that could engender colorable claims of constitutional deprivation. Defending these decisions, often years after they were made, could impose unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.*, at 425–426. The Court thus rejected the idea of applying the less-than-absolute "qualified immunity" that the law accords to other "executive or administrative officials," noting that the "honest prosecutor would face greater difficulty" than would those officials "in meeting the standards of qualified immunity." *Id.*, at 425. Accordingly, the immunity that the law grants prosecutors is "absolute." *Id.*, at 424.

The Court made clear that absolute immunity may not apply when a prosecutor is not acting as "an officer of the court," but is instead engaged in other tasks, say, investigative or administrative tasks. *Id.*, at 431, n. 33. To decide whether absolute immunity attaches to a particular kind of prosecutorial activity, one must take account of the "functional" considerations discussed above. See *Burns* v. *Reed*, 500 U. S. 478, 486 (1991) (collecting cases applying "functional approach" to immunity); *Kalina* v. *Fletcher*, 522 U. S. 118, 127, 130 (1997). In *Imbler*, the Court concluded that the "reasons for absolute immunity appl[ied] with full force" to the conduct at issue because it was "intimately associated with the judicial phase of the criminal process." 424 U. S., at 430. The fact that one constitutional duty at issue was a positive duty (the duty to supply "information relevant to the defense") rather than a negative duty (the duty not to "use . . . perjured testimony") made no difference. After all, a plaintiff can often transform a positive into a negative duty simply by reframing the pleadings; in either case, a constitutional violation is at issue. *Id.*, at 431, n. 34.

Finally, the Court specifically reserved the question whether or when "similar reasons require immunity for those aspects of the prosecutor's responsibility that cast him in the role of an administrator . . . rather than that of advocate." *Id.*, at 430–431. It said that "[d]rawing a proper line between these functions may present difficult questions, but this case does not require us to anticipate them." *Id.*, at 431, n. 33.

In the years since *Imbler*, we have held that absolute immunity applies when a prosecutor prepares to initiate a judicial proceeding, *Burns, supra,* at 492, or appears in court to present evidence in support of a search warrant application, *Kalina, supra,* at 126. We have held that absolute immunity does not apply when a prosecutor gives advice to police during a criminal investigation, see *Burns, supra,* at 496, when the prosecutor makes statements to the press, *Buckley* v. *Fitzsimmons*, 509 U. S. 259, 277 (1993), or when a prosecutor acts as a complaining witness in support of a warrant application, *Kalina*, *supra,* at 132 (SCALIA, J., concurring). This case, unlike these earlier cases, requires us to consider how immunity applies where a prosecutor is engaged in certain administrative activities.

## III

Goldstein claims that the district attorney and his chief assistant violated their constitutional obligation to provide his attorney with impeachment-related information, see *Giglio,* 405 U. S. 150, because, as the Court of Appeals wrote, they failed "to adequately train and supervise deputy district attorneys on that subject," 481 F. 3d, at 1176, and because, as Goldstein's complaint adds, they "failed to create any system for the Deputy District Attorneys handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information." App. 45. We agree

with Goldstein that, in making these claims, he attacks the office's administrative procedures. We are also willing to assume with Goldstein, but purely for argument's sake, that *Giglio* imposes certain obligations as to training, supervision, or information-system management.

Even so, we conclude that prosecutors involved in such supervision or training or information-system management enjoy absolute immunity from the kind of legal claims at issue here. Those claims focus upon a certain kind of administrative obligation—a kind that itself is directly connected with the conduct of a trial. Here, unlike with other claims related to administrative decisions, an individual prosecutor's error in the plaintiff's specific criminal trial constitutes an essential element of the plaintiff's claim. The administrative obligations at issue here are thus unlike administrative duties concerning, for example, workplace hiring, payroll administration, the maintenance of physical facilities, and the like. Moreover, the types of activities on which Goldstein's claims focus necessarily require legal knowledge and the exercise of related discretion, *e.g.*, in determining what information should be included in the training or the supervision or the information-system management. And in that sense also Goldstein's claims are unlike claims of, say, unlawful discrimination in hiring employees. Given these features of the case before us, we believe absolute immunity must follow.

## A

We reach this conclusion by initially considering a hypothetical case that involves supervisory or other office prosecutors but does not involve administration. Suppose that Goldstein had brought such a case, seeking damages not only from the trial prosecutor but also from a supervisory prosecutor or from the trial prosecutor's colleagues— all on the ground that they should have found and turned

over the impeachment material about Fink. *Imbler* makes clear that all these prosecutors would enjoy absolute immunity from such a suit. The prosecutors' behavior, taken individually or separately, would involve "[p]repara-tion . . . for . . . trial," 424 U. S., at 431, n. 33, and would be "intimately associated with the judicial phase of the criminal process" because it concerned the evidence pre-sented at trial. *Id.,* at 430. And all of the considerations that this Court found to militate in favor of absolute im-munity in *Imbler* would militate in favor of immunity in such a case.

The only difference we can find between *Imbler* and our hypothetical case lies in the fact that, in our hypothetical case, a prosecutorial supervisor or colleague might himself be liable for damages *instead of* the trial prosecutor. But we cannot find that difference (in the pattern of liability among prosecutors within a single office) to be critical. Decisions about indictment or trial prosecution will often involve more than one prosecutor within an office. We do not see how such differences in the pattern of liability among a group of prosecutors in a single office could alle-viate *Imbler'*s basic fear, namely, that the threat of dam-ages liability would affect the way in which prosecutors carried out their basic court-related tasks. Moreover, this Court has pointed out that "it is the interest in protecting the proper functioning of the office, rather than the inter-est in protecting its occupant, that is of primary impor-tance." *Kalina*, 522 U. S., at 125. Thus, we must assume that the prosecutors in our hypothetical suit would enjoy absolute immunity.

## B

Once we determine that supervisory prosecutors are immune in a suit directly attacking their actions related to an individual trial, we must find they are similarly im-mune in the case before us. We agree with the Court of

Appeals that the office's *general* methods of supervision and training are at issue here, but we do not agree that that difference is critical for present purposes. That difference does not preclude an intimate connection between prosecutorial activity and the trial process. The management tasks at issue, insofar as they are relevant, concern how and when to make impeachment information available at a trial. They are thereby directly connected with the prosecutor's basic trial advocacy duties. And, in terms of *Imbler*'s functional concerns, a suit charging that a supervisor made a mistake directly related to a particular trial, on the one hand, and a suit charging that a supervisor trained and supervised inadequately, on the other, would seem very much alike.

That is true, in part, for the practical reason that it will often prove difficult to draw a line between *general* office supervision or office training (say, related to *Giglio*) and *specific* supervision or training related to a particular case. To permit claims based upon the former is almost inevitably to permit the bringing of claims that include the latter. It is also true because one cannot easily distinguish, for immunity purposes, between claims based upon training or supervisory failures related to *Giglio* and similar claims related to other constitutional matters (obligations under *Brady* v. *Maryland*, 373 U. S. 83 (1963), for example). And that being so, every consideration that *Imbler* mentions militates in favor of immunity.

As we have said, the type of "faulty training" claim at issue here rests in necessary part upon a consequent error by an individual prosecutor in the midst of trial, namely, the plaintiff's trial. If, as *Imbler* says, the threat of damages liability for such an error could lead a trial prosecutor to take account of that risk when making trial-related decisions, so, too, could the threat of more widespread liability throughout the office (ultimately traceable to that trial error) lead both that prosecutor and other office

prosecutors as well to take account of such a risk.  Indeed, members of a large prosecutorial office, when making prosecutorial decisions, could have in mind the "consequences in terms of" damages liability whether they are making general decisions about supervising or training or whether they are making individual trial-related decisions. *Imbler,* 424 U. S., at 424.

Moreover, because better training or supervision might prevent most, if not all, prosecutorial errors at trial, permission to bring such a suit here would grant permission to criminal defendants to bring claims in other similar instances, in effect claiming damages for (trial-related) training or supervisory failings.  Cf. *Imbler, supra.*  Further, given the complexity of the constitutional issues, inadequate training and supervision suits could, as in *Imbler*, "pose substantial danger of liability even to the honest prosecutor." *Id.*, at 425.  Finally, as *Imbler* pointed out, defending prosecutorial decisions, often years after they were made, could impose "unique and intolerable burdens upon a prosecutor responsible annually for hundreds of indictments and trials." *Id.*, at 425–426.

At the same time, to permit this suit to go forward would create practical anomalies.  A trial prosecutor would remain immune, even for *intentionally* failing to turn over, say *Giglio* material; but her supervisor might be liable for *negligent* training or supervision.  Small prosecution offices where supervisors can personally participate in all of the cases would likewise remain immune from prosecution; but large offices, making use of more general office-wide supervision and training, would not.  Most important, the ease with which a plaintiff could restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision would eviscerate *Imbler*.

We conclude that the very reasons that led this Court in *Imbler* to find absolute immunity require a similar finding

in this case. We recognize, as Chief Judge Hand pointed out, that sometimes such immunity deprives a plaintiff of compensation that he undoubtedly merits; but the impediments to the fair, efficient functioning of a prosecutorial office that liability could create lead us to find that *Imbler* must apply here.

C

We treat separately Goldstein's claim that the Los Angeles County District Attorney's Office should have established a system that would have permitted prosecutors "handling criminal cases to access information pertaining to the benefits provided to jailhouse informants and other impeachment information." App. 45. We do so because Goldstein argues that the creation of an information management system is a more purely administrative task, less closely related to the "judicial phase of the criminal process," *Imbler, supra,* at 430, than are supervisory or training tasks. He adds that technically qualified individuals other than prosecutors could create such a system and that they could do so prior to the initiation of criminal proceedings.

In our view, however, these differences do not require a different outcome. The critical element of any information system is the information it contains. Deciding what to include and what not to include in an information system is little different from making similar decisions in respect to training. Again, determining the criteria for inclusion or exclusion requires knowledge of the law.

Moreover, the absence of an information system is relevant here if, and only if, a proper system would have included information about the informant Fink. Thus, were this claim allowed, a court would have to review the office's legal judgments, not simply about *whether* to have an information system but also about *what kind* of system is appropriate, and whether an appropriate system would

have included *Giglio*-related information *about one particular kind of trial informant.* Such decisions—whether made prior to or during a particular trial—are "intimately associated with the judicial phase of the criminal process." *Imbler*, *supra,* at 430*;* see *Burns*, 500 U. S., at 486. And, for the reasons set out above, all *Imbler'*s functional considerations (and the anomalies we mentioned earlier, *supra*, at 10) apply here as well.

We recognize that sometimes it would be easy for a court to determine that an office's decision about an information system was inadequate. Suppose, for example, the office had no system at all. But the same could be said of a prosecutor's trial error. Immunity does not exist to help prosecutors in the easy case; it exists because the easy cases bring difficult cases in their wake. And, as *Imbler* pointed out, the likely presence of too many difficult cases threatens, not prosecutors, but the public, for the reason that it threatens to undermine the necessary independence and integrity of the prosecutorial decision-making process. Such is true of the kinds of claims before us, to all of which *Imbler'*s functional considerations apply. Consequently, where a §1983 plaintiff claims that a prosecutor's management of a trial-related information system is responsible for a constitutional error at his or her particular trial, the prosecutor responsible for the system enjoys absolute immunity just as would the prosecutor who handled the particular trial itself.

\*    \*    \*

For these reasons we conclude that petitioners are entitled to absolute immunity in respect to Goldstein's claims that their supervision, training, or information-system management was constitutionally inadequate. Accordingly, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*