FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| JAVIER TORRES; LIA RIVADENEYRA, individually and on behalf of all others similarly situated, *Plaintiffs-Appellants*, | No. 12-17096 D.C. No. 2:06-cv-02482-SMM |
| v. | |
| TERRY GODDARD, in his individual capacity; COLIN HOLMES, in his individual capacity as personal representative of the estate of Cameron Holmes; MARK BRNOVICH, Attorney General of the State of Arizona, *Defendants-Appellees*. | OPINION |

Appeal from the United States District Court
for the District of Arizona
Stephen M. McNamee, Senior District Judge, Presiding

Argued and Submitted
January 28, 2014—University of Nevada, Las Vegas

Filed July 16, 2015

Before: Stephen Reinhardt, Alex Kozinski,
and Jay S. Bybee, Circuit Judges.

Opinion by Judge Kozinski

# SUMMARY[*]

## Civil Rights

The panel affirmed in part and reversed in part the district court's summary judgment, and remanded in an action brought under 42 U.S.C. § 1983 against Arizona state officials who executed over twenty warrants to seize thousands of wire transfers that officials alleged were likely to be connected to criminal conduct associated with the smuggling of undocumented aliens into the United States.

The panel first held that absolute immunity is available to prosecutors in the context of civil forfeiture proceedings. The panel held that Arizona Assistant Attorney General Cameron Holmes's preparation of and application for the warrants were intimately associated with the judicial phase of civil forfeiture proceedings, and therefore protected by absolute immunity. The panel held however that Holmes's service and execution of the seizure warrants were not protected by absolute immunity because those acts are functions of police officers, not the traditional functions of an advocate. The panel expressed no opinion as to whether Holmes was entitled to qualified immunity.

The panel held that Terry Goddard, in his individual capacity as the Arizona Attorney General at the time the seizure warrants were carried out, was protected by absolute immunity for supervision of Holmes's preparation of and application for the warrants. Goddard could not claim

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

absolute immunity with respect to his supervision of Holmes's service and execution of the seizure warrants because his supervision was a function of a supervising police officer, not a supervising prosecutor.

The panel held that plaintiffs waived the issue of whether the district court erred by granting summary judgment on the official capacity claims against Thomas Horne, Goddard's successor as Arizona Attorney General. The panel expressed no opinion as to whether the district court abused its discretion by denying plaintiffs' motion for class certification.

## COUNSEL

Matthew J. Piers, Joshua Karsh, Christopher J. Wilmes (argued), Hughes Socol Piers Resnick & Dym, Ltd., Chicago, Illinois, for Plaintiffs-Appellants.

Thomas C. Horne, Arizona Attorney General, David D. Weinzweig (argued) and Evan Hiller, Assistant Attorneys General, Phoenix, Arizona, for Defendants-Appellees.

## OPINION

KOZINSKI, Circuit Judge:

The state of Arizona had a coyote problem: Not the four-legged furry kind that occasionally abscond with pets, but the kind who smuggle undocumented aliens into the United States for a fee. As part of the effort to combat the proliferation of coyotes, between 2001 and 2006 Arizona officials executed over twenty warrants to seize thousands of wire transfers that they claimed were highly likely to be connected to criminal conduct. Plaintiffs sent money via Western Union that was seized pursuant to two of these warrants. They allege the seizures were unconstitutional and seek damages, as well as injunctive and declaratory relief, against the state officials they claim are responsible for the seizures. We determine whether defendants' actions are protected by absolute immunity.

## I.  BACKGROUND

The warrant program was carried out by the Arizona Financial Crimes Task Force. The Task Force consisted of personnel from several public agencies including the Arizona Attorney General's Office. Cameron Holmes, an Assistant Attorney General and civil forfeiture prosecutor, worked with the Task Force. Holmes sought court approval for and obtained seizure warrants pursuant to Arizona's civil forfeiture statutes. *See* Ariz. Rev. Stat. Ann. § 13-4305(A)(1).

While some of the earlier warrants sought seizure of wire transfers involving specific names listed in the warrants, later warrants, or "sweeps," authorized seizure of all wire transfers that met certain specified criteria. The six "criteria-based" warrants identified in plaintiffs' complaint authorized the seizure of every person-to-person Western Union wire transfer that (1) was sent from certain states to Arizona or, under one warrant, from certain states to Sonora, Mexico; (2) met or exceeded a threshold amount ranging from $500 to $2000; and (3) was made during a certain time period—typically three or four weeks in the spring or fall. Accompanying the warrant applications were factual affidavits sworn to by Task Force detectives. The affidavits claimed that any wire transfer that met the warrants' criteria had a very high likelihood, for some warrants as high as 97 percent, of being "directly involved in illegal drug and/or human smuggling."

The seizures followed the same basic pattern. Holmes supervised the preparation of the seizure warrants and warrant applications. Holmes also reviewed the factual affidavits sworn to by Task Force detectives "in order to satisfy [himself] that the seizure warrant[s] being applied for [were] supported by probable cause." Holmes then sought approval of the warrants before a state court judge. Once the warrants were approved, Holmes served them on Western Union's corporate headquarters. The warrants were "effective upon receipt" by Western Union. They required Western Union to identify all wire transfers that met the listed criteria and "cause the transaction[s] to be 'force paid' to a detention account" maintained for the state by Western Union. Western

Union seized the funds on the state's behalf by loading the criteria into its computer system. When a wire transfer that met all the criteria listed in a warrant was initiated, Western Union's computer system automatically diverted the transfer to Arizona's detention account. While the seized funds were held by Western Union, they were considered to be in the "constructive custody of the law enforcement agency making the seizure for forfeiture."

Although the affidavits claimed that a wire transfer that met the warrants' criteria had a high likelihood of being subject to forfeiture, they acknowledged that some transfers detained by Western Union may "not [be] involved in the conduct described in the affidavit." The warrants therefore required the state to notify the consignee of the seizure and staff a 24-hour hotline. Arizona officials operated this "call center" and "[made] decisions as to whether particular money transfers could be released from seizure." *See* Ariz. Rev. Stat. Ann. § 13-4306(A). If the call center official was satisfied that the transfer was for a legitimate purpose, the funds were released. If the official was not so convinced, or if the call center wasn't contacted about the seized transfer, the funds remained in the detention account. The funds were detained by Western Union for the period of the warrant plus twenty-one days. At the end of the detention period, the warrants required Western Union to convey all unreleased funds to a bank account maintained by the Maricopa County

Superior Court.[1]    Holmes subsequently brought civil forfeiture proceedings against these funds.

Plaintiffs Javier Torres and Lia Rivadeneyra sent funds via Western Union that were seized pursuant to two of the warrants.    Their section 1983 complaint alleges that defendants, "both personally and through agents or representatives," "served and executed" the criteria-based warrants and "have illegally seized more than $9 million in interstate and international money transfers." Plaintiffs allege that the seizures were unconstitutional because they were

---

[1] The funds detained by Sweep 21, the warrant that authorized seizure of funds sent from outside Arizona to Sonora, Mexico, never made it into state custody.  As soon as this warrant was served, Western Union challenged it on the ground that Arizona lacked in rem jurisdiction over these funds.  The Maricopa County Superior Court quashed the warrant, thereby preventing Western Union from transferring the funds detained pursuant to Sweep 21 to the State of Arizona.  The Arizona Supreme Court agreed and held that Arizona couldn't exercise in rem jurisdiction over funds transferred from other states to Sonora because those funds were never present in Arizona.  *State* v. *W. Union Fin. Servs., Inc.*, 208 P.3d 218, 223–27 (Ariz. 2009) (citing *Shaffer* v. *Heitner*, 433 U.S. 186, 212 (1977)).

The other warrants were limited to funds sent to Arizona and weren't challenged on that ground.  Despite the differences between Sweep 21 and the other warrants identified in the complaint, our absolute immunity analysis is the same because plaintiffs allege that defendants performed the same functions with respect to all of the warrants.  *See* pp. 13–25 *infra*; *Kalina* v. *Fletcher*, 522 U.S. 118, 127 (1997) (whether absolute immunity applies depends on "the nature of the function performed" (internal quotation marks and citation omitted)).  But that's not necessarily true of qualified immunity.  That protection depends on "whether the right at issue was 'clearly established' at the time of defendant's alleged misconduct."  *Pearson* v. *Callahan*, 555 U.S. 223, 232 (2009) (citation omitted).  We leave the qualified immunity question to the district court on remand.  *See* pp. 20–21, 25–26 *infra*.

conducted without "particularized probable cause" to believe that their wire transfers "were involved in," or "were the fruits or instrumentalities of, any of the stated criminal offenses" in the warrants. They seek damages and restitution of the seized funds, as well as injunctive and declaratory relief. They also seek to represent a Rule 23(b)(3) class consisting of all persons whose wire transfers were seized pursuant to the six criteria-based warrants.

The complaint initially named two defendants: Holmes, in his individual capacity, and Terry Goddard, Arizona's Attorney General at the time the seizure warrants were carried out and at the time the complaint was filed, in his individual and official capacities. Holmes died while this appeal was pending, and was replaced as a defendant by the personal representative of his estate, Colin Holmes. Goddard was succeeded by Thomas Horne as Arizona's Attorney General after the lawsuit was filed, and Horne replaced Goddard as a defendant in his official capacity. Horne was succeeded by Mark Brnovich while this appeal was pending, and Brnovich replaced Horne as a defendant in his official capacity. Horne is no longer a defendant and Goddard remains a defendant in his individual capacity only.

The district court granted summary judgment to Holmes and Goddard, finding their actions protected by absolute immunity. In the district court's view, "government attorneys are absolutely immune from liability under [section 1983] for acts involving or related to litigation," and all of Holmes's and Goddard's actions were so related. The district court also granted summary judgment to Horne (the Attorney General at the time) on plaintiffs' official capacity claim because plaintiffs hadn't "alleged or argued how the Attorney General's office violated their constitutional rights." We

have jurisdiction pursuant to 28 U.S.C. § 1291 and review claims of absolute immunity de novo. *See Genzler* v. *Longanbach*, 410 F.3d 630, 636 (9th Cir. 2005).

## II. ABSOLUTE IMMUNITY

In *Imbler* v. *Pachtman*, 424 U.S. 409 (1976), the Supreme Court held that criminal prosecutors may claim absolute immunity from damages liability for actions "intimately associated with the judicial phase of the criminal process," such as the prosecutor's initiation of a prosecution and presentation of the state's case. *Id.* at 430. Absolute prosecutorial immunity is meant to "protect[] the prosecutor from harassing litigation that would divert his time and attention from his official duties" and to "enabl[e] him to exercise independent judgment when 'deciding which suits to bring and in conducting them in court.'" *Kalina* v. *Fletcher*, 522 U.S. 118, 125 (1997) (quoting *Imbler*, 424 U.S. at 424); *see also Lacey* v. *Maricopa Cnty.*, 693 F.3d 896, 912 (9th Cir. 2012) (en banc).

But "the actions of a prosecutor are not absolutely immune merely because they are performed by a prosecutor." *Buckley* v. *Fitzsimmons*, 509 U.S. 259, 273 (1993). Because absolute prosecutorial immunity stems from "the interest in protecting the proper functioning of the office, rather than the interest in protecting its occupant," the touchstone is "the nature of the function performed, not the identity of the actor who performed it." *Kalina*, 522 U.S. at 125, 127 (quoting *Forrester* v. *White*, 484 U.S. 219, 229 (1988)) (internal quotation marks omitted). A prosecutor is absolutely immune "when performing the traditional functions of an advocate." *Id.* at 131. However, he is not entitled to such protection when he is "cast [] in the role of an administrator or

investigative officer rather than that of advocate." *Id.* at 125 (quoting *Imbler*, 424 U.S. at 430–31) (internal quotation marks omitted). We must therefore focus "on the conduct for which immunity is claimed, not on the harm that the conduct may have caused or the question whether it was lawful." *Buckley*, 509 U.S. at 271.

## A. Absolute Immunity in the Civil Forfeiture Context

While *Imbler* arose in the context of a criminal prosecution, this lawsuit arises from a civil forfeiture proceeding. Therefore, before considering the specific actions of Holmes and Goddard, we must determine whether absolute immunity is available at all to a prosecutor conducting a civil forfeiture proceeding. Although the Supreme Court hasn't directly addressed this question, it has extended the reasoning of *Imbler* to agency officials "performing certain functions analogous to those of a prosecutor." *Butz* v. *Economou*, 438 U.S. 478, 515 (1978). The plaintiff in *Butz* was a commodities merchant who claimed that officials from the Department of Agriculture vindictively instituted administrative proceedings against him in retaliation for his criticism of the agency. *Id.* at 480. He brought damages claims against a number of federal officials, including the Department of Agriculture attorney who prosecuted the enforcement proceeding, alleging that the officials violated his constitutional rights. *Id.* at 481–82.

The Court held that "adjudication within a federal administrative agency shares enough of the characteristics of the judicial process that those who participate in such adjudication" are entitled to absolute immunity. *Id.* at 512–13. Consequently, absolute immunity extends to "agency officials performing certain functions analogous to

those of a prosecutor." *Id.* at 515. That's because, just like a criminal prosecutor, "[t]he discretion which executive officials exercise with respect to the initiation of administrative proceedings might be distorted" in the absence of absolute immunity. *Id.* (citing *Imbler*, 424 U.S. at 426 n.24). An agency official's decision to initiate proceedings must be able to be made "free from intimidation or harassment." *Id.* at 516. And the procedural safeguards available to the defendant give him an "ample opportunity to challenge the legality of the proceeding" and "provide sufficient checks on agency zeal." *Id.* at 515–16; *see also Fry* v. *Melaragno*, 939 F.2d 832, 836–38 (9th Cir. 1991).

The reasoning of *Butz* applies with equal or greater force in the civil forfeiture context. In rem proceedings seeking the forfeiture of property connected to criminal activity are functionally analogous to criminal proceedings. *See United States* v. *U.S. Coin & Currency*, 401 U.S. 715, 719 (1971). They are frequently brought in connection with, or immediately followed by, a criminal prosecution. A government attorney in a forfeiture proceeding prosecutes and seeks to establish "the 'guilt' of the property seized." *United States* v. *One 1985 Mercedes*, 917 F.2d 415, 419 (9th Cir. 1990) (citation omitted). Like a criminal prosecutor, a civil forfeiture prosecutor is "likely to provoke 'with some frequency' retaliatory suits by angry defendants." *Butz*, 438 U.S. at 510 (quoting *Imbler*, 424 U.S. at 425). Providing a civil forfeiture prosecutor with only qualified immunity "might have an adverse effect on the functioning" of the civil forfeiture system by "discouraging the initiation of [in rem civil forfeiture] prosecutions" and impacting the manner in which the attorney conducts a forfeiture prosecution. *Id.*

In rem civil forfeiture proceedings like those conducted by Holmes in this case also carry sufficient procedural safeguards "to reduce the need for private damages actions as a means of controlling unconstitutional conduct." *Id.* at 512. All persons known to have an interest in the seized property are entitled to reasonable notice of pending forfeiture. *See* Ariz. Rev. Stat. Ann. §§ 13-4306(C), 13-4307. The property owners may appear in court and challenge a proposed forfeiture. *See, e.g.*, *id.* §§ 13-4309, 13-4310. The forfeiture proceedings are conducted before an impartial state court judge. *See, e.g.*, *id.* § 13-4311. In such a proceeding, anyone disputing the forfeiture may testify, introduce evidence and present and cross-examine witnesses. *See, e.g.*, *id.* § 13-4311(L).

We therefore hold that absolute immunity is available to prosecutors in the context of civil forfeiture proceedings. In doing so, we join every other circuit that has addressed this question. *See Schrob* v. *Catterson*, 948 F.2d 1402, 1411–13 (3d Cir. 1991); *see also Cooper* v. *Parrish*, 203 F.3d 937, 947–48 (6th Cir. 2000); *Mendenhall* v. *Goldsmith*, 59 F.3d 685, 691 (7th Cir. 1995); *Ehrlich* v. *Giuliani*, 910 F.2d 1220, 1222–24 (4th Cir. 1990).

## B.  Holmes in His Individual Capacity

We now turn to whether absolute immunity attaches to the specific actions taken by Holmes. Like a criminal prosecutor, a civil forfeiture prosecutor isn't entitled to absolute immunity merely because of his status as a prosecutor. Rather, we must evaluate each act a civil forfeiture prosecutor took and determine whether the prosecutor was performing a function that's protected by absolute immunity. *See Milstein* v. *Cooley*, 257 F.3d 1004,

1011–13 (9th Cir. 2001) (evaluating absolute immunity act by act).  The "official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question."  *Burns* v. *Reed*, 500 U.S. 478, 486 (1991).

## 1. Preparation and Application

Holmes oversaw the preparation of the warrants, warrant applications and factual affidavits.  He also reviewed and edited the factual affidavits that were sworn to by Task Force detectives to satisfy himself that the warrants were supported by probable cause.  He then presented the warrant applications to a state court judge for approval.

Whether a prosecutor's application for a warrant is protected by absolute immunity depends on the function the warrant serves.  The prosecutor in *Kalina* had "commenced a criminal proceeding against [the plaintiff] by filing three documents": "an information charging [the plaintiff] with burglary"; "a motion for an arrest warrant"; and a probable cause certification that "summarized the evidence supporting the charge."  522 U.S. at 120–21.  The Supreme Court held that the prosecutor's "activities in connection with the preparation and filing of" the information and the motion for an arrest warrant were protected by absolute immunity.  *Id.* at 129.  These activities were "the work of an advocate and [were] integral to the initiation of the prosecution."  *Id.* at 130.  And in *KRL* v. *Moore*, 384 F.3d 1105 (9th Cir. 2004), we held that a prosecutor was entitled to absolute immunity when procuring a search warrant, when the warrant "sought evidence to prosecute the crimes charged in the indictment."  *Id.* at 1112.  Because the prosecutor obtained the warrant to

"marshal evidence for trial," he was performing a "traditional function of an advocate for the [s]tate." *Id.* at 1112–13.

However, a warrant may also be sought for an investigative purpose. *See Genzler*, 410 F.3d at 638 (citing *KRL*, 384 F.3d at 1110–16). In *KRL*, we held that the prosecutor wasn't entitled to absolute immunity when he sought a search warrant that "went beyond any legitimate preparation to prosecute" the plaintiff for the crimes charged, and was instead part of a "collateral investigation into new crimes." 384 F.3d at 1113–14. We treated this second warrant differently, not because the prosecutor's acts were different, but because the prosecutor sought the warrant for a different purpose. *Id.*; *Genzler*, 410 F.3d at 642–43. Thus, when evaluating an act such as the procurement of a warrant, we "take into account the goal of performing [the] action to determine function." *al-Kidd* v. *Ashcroft*, 580 F.3d 949, 960 (9th Cir. 2009), *rev'd on other grounds*, 131 S. Ct. 2074 (2011).

Plaintiffs argue that the warrants here fall on the investigative side of the line. They point out that, unlike the prosecutor in *Kalina*, Holmes prepared and applied for the warrants before he filed any forfeiture complaints against the seized property. And, because the Task Force set up a call center to help weed out legal transfers, Holmes never filed forfeiture complaints against some of the funds. They argue that this multi-step process—a seizure warrant, followed by the call center, followed by a forfeiture complaint only in some cases—raises an issue of fact as to whether Holmes applied for the warrants in order to initiate forfeiture proceedings or instead used the warrants as an investigative tool.

But plaintiffs' position misapprehends the role of a court-issued seizure warrant in Arizona's civil forfeiture process. While seizure for forfeiture can be accomplished in several ways, *see* Ariz. Rev. Stat. Ann. § 13-4305(A), the warrants Holmes prepared and applied for required a prior judicial determination of probable cause that the property was subject to forfeiture. *See id.* §§ 13-4305(A)(1), 13-4310(B). The seizure warrants couldn't be used to conduct an investigation that might lead to a probable cause determination. Rather, in order for the warrants to be issued, the attorney for the state was first required to make that determination, prepare a warrant with a supporting factual affidavit and seek issuance of the warrant by a judge. That's why the seizure warrants issued in this case stated that there was "probable cause to believe that conduct giving rise to forfeiture has occurred with respect to all of the property" covered by the warrants, and that "forfeiture is authorized pursuant to" Arizona's forfeiture statutes. Thus, Holmes wasn't performing the "detective's role in searching for the clues and corroboration that might give him probable cause." *Kalina*, 522 U.S. at 126 (quoting *Buckley*, 509 U.S. at 273). Rather, upon review of the factual affidavits sworn to by Task Force detectives, Holmes determined that there was probable cause to believe that the property covered by the warrants was subject to forfeiture. Only then did Holmes apply for the warrants.

Moreover, seizure of the property is "integral to the initiation of" an in rem civil forfeiture proceeding, *id.* at 130, because it's a "prerequisite to the court's jurisdiction," *State v. One Single Family Residence at 1810 E. Second Ave.*, 969 P.2d 166, 169 (Ariz. Ct. App. 1997) (citing *Republic Nat'l Bank of Miami* v. *United States*, 506 U.S. 80, 84 (1992)). Although the court's issuance of a seizure warrant doesn't constitute a civil forfeiture complaint, "[t]he *in rem*

complaint and the seizure warrant are intimately connected—
one follows the other and effectuates it." *Schrob*, 948 F.2d at
1416. Holmes's preparation of and application for seizure
warrants is the civil forfeiture analog to the prosecutor's
application for an arrest warrant in *Kalina*. These actions are
likewise shielded by absolute immunity and may not form the
basis of a claim for damages.

Arizona's insertion of an intermediate step that allowed
for the rapid release of some seized funds doesn't change the
character of Holmes's actions. While Arizona law authorizes
the release of property seized for forfeiture "if forfeiture or
retention is unnecessary," Ariz. Rev. Stat. Ann. § 13-
4306(A), nothing prevented Arizona from seeking forfeiture
of every seized wire transfer. When a prosecutor decides to
initiate a criminal proceeding, he is surely aware that he may
have to terminate the proceeding if the factual allegations that
supported probable cause turn out to be untrue. That doesn't
mean that the prosecutor's initiation of the proceeding (or the
acts he takes in preparation for it) aren't protected by absolute
immunity. In *Kalina*, for example, the Supreme Court held
that the prosecutor's preparation and filing of the arrest
warrant were protected by absolute immunity even though the
criminal charges were subsequently dismissed. 522 U.S. at
122. State officials do not lose absolute immunity by
constructing an additional step in the civil forfeiture process
to avoid unnecessary judicial proceedings.

### 2. Service and Execution

If Holmes's actions were limited to preparing and
applying for the warrants, our analysis of his absolute
immunity could end there. However, plaintiffs also allege
that "defendants served and executed" the warrants and

"illegally seized" the funds.  Plaintiffs argue that, even if we find that Holmes's preparation and application for the seizure warrants were acts of advocacy protected by absolute immunity, serving and executing of seizure warrants are acts that "could have been performed by police officers" and thus can't be shielded by absolute immunity.  Because we must evaluate absolute immunity act by act, we must also consider whether absolute immunity bars damages claims based on a forfeiture prosecutor's service and execution of the seizure warrants he applied for.

Arizona's civil forfeiture statutes make clear that the seizure of property pursuant to a seizure warrant is the function of police officers, not prosecutors.  The "[a]ttorney for the state" is designated to "investigate, commence and prosecute an action under this chapter," Ariz. Rev. Stat. Ann. § 13-4301(1), whereas the "[s]eizing agency" "employs the peace officer who seizes property for forfeiture," *id.* § 13-4301(8).  "Seizure for forfeiture" is "seizure of property by a peace officer coupled with an assertion by the seizing agency or by an attorney for the state that the property is subject to forfeiture."  *Id.* § 13-4301(9).  Consistent with the civil forfeiture statutes, the seizure warrants themselves directed police officers, not the attorney for the state, to seize the subject property.  The warrants authorized "[a]ny peace officer" to "seize all of the property" that met the criteria "for forfeiture pursuant to" Arizona's civil forfeiture statutes. And, as the warrant applications explained, "the peace officers [would] carry out th[e] warrant[s] by serving [them] on Western Union at its corporate offices, requiring Western Union to transfer the described funds to the clerk of the Maricopa County Superior Court."

Nevertheless, it was Holmes, not Arizona police officers, who "carr[ied] out" the warrants in the manner described above.**[2]** In doing so, Holmes "performed an act that any [Arizona police officer] might have performed." *Kalina*, 522 U.S. at 129–30. And "[w]hen the functions of prosecutors and [police officers] are the same, as they were here, the immunity that protects them is also the same." *Buckley*, 509 U.S. at 276; *see also Burns*, 500 U.S. at 492–96. Because Holmes went beyond the "traditional functions of an advocate" and "carr[ied] out" the warrants, he was only entitled to the qualified immunity that a police officer would receive when doing so.

Defendants argue that such a result "mistakenly focus[es] on the description of [the] alleged misconduct alone rather than the function being performed." They insist that absolute immunity extends to Holmes's service of the warrants because service is "an essential step in the initiation of a forfeiture action," and "was not an investigative technique." In other words, defendants argue that Holmes was performing a "prosecutorial function" when he served the warrants because service is a prerequisite to forfeiture.

---

**[2]** Defendants claim that, because plaintiffs' response to their cross-motion for summary judgment states that Holmes "reviewed, approved, procured and served" the warrants, plaintiffs waived the right to contest Holmes's absolute immunity with respect to "execution." But plaintiffs have never conceded that any of Holmes's actions are protected by absolute immunity. Moreover, on the record before us, a distinction between "service" and "execution" of the warrants is only semantic. The warrants were "effective upon receipt" by Western Union. They required Western Union to seize all transfers that met their criteria on the state's behalf. Regardless of whether Holmes's actions are characterized as "service and execution" of the warrants or, as the warrant applications state, "carry[ing] out" the warrants, plaintiffs haven't waived the right to contest Holmes's immunity with respect to his role in the actual seizures.

This argument can't be squared with the Supreme Court's reasoning in *Kalina*, where the Court distinguished between the prosecutor's preparation and filing of the information and motion for an arrest warrant (which were shielded by absolute immunity), and her *personal* attestation to the factual allegations in the probable cause certification (which was not). 522 U.S. at 130. Although all of the prosecutor's acts were prerequisites to the initiation of the prosecution, personally attesting to the factual allegations contained in the certification cast the prosecutor in the role of a witness, not an attorney. *Id.* at 131. The Court's distinction between this act, and the other protected acts, didn't depend on whether it was "investigative."**[3]** Rather, absolute immunity didn't attach because the prosecutor wasn't performing the function of an advocate. The Court rejected the prosecutor's argument that absolute immunity applied because her personal attestation to the factual allegations "was just one incident in a presentation that, viewed as a whole, was the work of an advocate and was integral to the initiation of the prosecution." *Id.* at 130. We similarly reject the analogous argument defendants advance here. Serving and executing seizure warrants are the functions of police officers, not the "traditional functions of

---

**[3]** That doesn't mean that whether a prosecutor's act was investigative is irrelevant to absolute immunity. In *Buckley*, the Court held that a prosecutor wasn't entitled to absolute immunity because his actions were "investigative functions normally performed by a detective or police officer." 509 U.S. at 273; *see also Burns*, 500 U.S. at 492–96. Therefore, if a prosecutor acts in an investigative capacity, he's not protected by absolute immunity. But under *Kalina*, the fact that a prosecutor's act *isn't* investigative, and may be necessary to the commencement of a prosecution, doesn't *guarantee* absolute immunity. Rather, absolute immunity only applies when the prosecutor is performing the "traditional functions of an advocate." *Kalina*, 522 U.S. at 131.

an advocate," *id.* at 131, and thus under *Kalina* are functions that aren't protected by absolute immunity.

We acknowledge that our application of the functional approach means that Holmes is entitled to absolute immunity with respect to some acts but not others, even though all of plaintiffs' claims are predicated on the same constitutional violation: seizure of their funds without probable cause. However, the result we reach is the "essence of the function test" because absolute immunity is based on the nature of the function performed, not the underlying constitutional claim. *Buckley*, 509 U.S. at 274 n.5. Critically, if Holmes's service and execution of the warrants were acts protected by absolute immunity, we'd be faced with an "incongruous" result where a prosecutor performing the function of a police officer would be entitled to absolute immunity merely because of his status as a prosecutor. *See id.* at 275 n.6 (quoting *Burns*, 500 U.S. at 495). Service of the self-executing seizure warrants merely carried out the command of the warrants; it wasn't a "function[] that require[s] the exercise of prosecutorial discretion." *Kalina*, 522 U.S. at 125. Extending absolute immunity to this type of police activity would be inconsistent with the distinction drawn by the Supreme Court in *Kalina*.

We express no opinion as to whether Holmes is entitled to qualified immunity. Although defendants raised qualified immunity in their cross motion for summary judgment, the district court didn't reach the issue because it held that absolute immunity barred all of plaintiffs' claims. The parties did not brief the issue on appeal. We therefore remand to the district court to determine, in the first instance, whether Holmes's actions in serving and executing the warrants are protected by qualified immunity. If the district court determines that any of Holmes's actions aren't

protected by qualified immunity, it must then go on to assess whether those unprotected acts (and only those acts) give rise to a cause of action for damages against Holmes under section 1983. *See Buckley*, 509 U.S. at 274 n.5.

## C. Goddard in His Individual Capacity

Goddard was Arizona's Attorney General at the time the warrants were carried out and at the time the complaint was filed. He was succeeded by Horne (and Horne by Brnovich) while this lawsuit was pending. Goddard thus remains a defendant only in his individual capacity. Unlike an official capacity claim, where the constitutional injury "must be attributable to [an] official policy or custom," an individual capacity claim "hinges upon [the individual defendant's] participation in the deprivation of constitutional rights." *Larez* v. *City of Los Angeles*, 946 F.2d 630, 645 (9th Cir. 1991). Plaintiffs don't allege Goddard was directly involved in the preparation, filing, service or execution of the warrants. They nevertheless claim that Goddard "could have stopped the criteria-based warrant program but chose not to." Plaintiffs argue that Goddard had a duty to exercise his supervisory authority over the Arizona officials who were responsible for procuring and carrying out the seizure warrants and, by failing to do so, is also subject to section 1983 liability for the seizures. *See Cunningham* v. *Gates*, 229 F.3d 1271, 1292 (9th Cir. 2000).

## 1. Preparation and Application

Holmes's preparation of and application for the warrants were "intimately associated with the judicial phase" of the civil forfeiture proceedings, *Imbler*, 424 U.S. at 430, and therefore protected by absolute immunity. Goddard's

supervision of these activities is likewise protected by absolute immunity under *Van de Kamp* v. *Goldstein*, 555 U.S. 335, 345 (2009). In *Van de Kamp*, Goldstein had alleged that the trial prosecutors who conducted his case didn't tell him that a jailhouse informant who testified against him at his trial previously received favorable treatment in exchange for his testimony. *Id.* at 339. Goldstein sued the county district attorney and his chief deputy, alleging that the trial prosecutors' failure to disclose the informant's treatment resulted from their supervisors' failure to "adequately [] train and [] supervise" subordinate prosecutors and their "failure to establish an information system about informants." *Id.* at 340. Goldstein didn't claim that the supervisory prosecutors personally erred in his trial, but rather argued that they were liable because their "*general* methods of supervision" caused a "consequent error by an individual prosecutor" at his trial. *Id.* at 346.

The Supreme Court held that absolute immunity barred Goldstein's claims. In doing so, the Court considered a "hypothetical case" in which the failure to disclose the informant's treatment arose from a prosecutor's "*specific* supervision or training related to a particular case." *Id.* at 345–46. The Court concluded that the trial and supervisory prosecutors in that case would both be entitled to absolute immunity. The decision to disclose (or to not disclose) an informant's favorable treatment is an act that's "'intimately associated with the judicial phase of the criminal process' because it concern[s] the evidence presented at trial." *Id.* at 345 (quoting *Imbler*, 424 U.S. at 430). If a supervisory prosecutor wasn't entitled to absolute immunity for this conduct, such a rule would implicate "all of the considerations" that counseled in favor of immunity in *Imbler*, including "*Imbler*'s basic fear . . . that the threat of

damages liability would affect the way in which prosecutors carried out their basic court-related tasks." *Id.*[4]

Plaintiffs' claims against Goddard are analogous to the hypothetical case discussed in *Van de Kamp*. They don't arise from Goddard's "*general* methods of supervision," but rather arise from Goddard's "acequisece[nce]" and "ratifi[cation]" of Holmes's procurement of particular seizure warrants. Under *Van de Kamp*, the absolute immunity that protects Holmes's preparation and application for the warrants also protects Goddard's decision to permit Holmes to do so. There is no functional difference between a civil forfeiture prosecutor's preparation and application for seizure warrants, and his supervisor's decision to allow him to engage in those activities. A supervisor's decision to permit a subordinate prosecutor to prepare and apply for seizure warrants is an "act[] undertaken by [the supervisor] in preparing for the initiation of judicial proceedings," and "occur[s] in the course of [the supervisor's] role as an advocate for the [s]tate." *Kalina*, 522 U.S. at 126 (internal quotation marks omitted). Indeed, if the rule were otherwise, a plaintiff could just "restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision" and thereby "eviscerate *Imbler*." *Van de Kamp*, 555 U.S. at 347.

---

[4] Goldstein's complaint was different from the hypothetical case because his claims arose from defendants' "general methods of supervision." *Van de Kamp*, 555 U.S. at 346. But, as the Court explained, Goldstein's "general" claims nevertheless "rest[ed] in necessary part upon a consequent error by an individual prosecutor in the midst of trial." *Id.* The challenged procedures related to "how and when to make impeachment information available at a trial." *Id.* They were "directly connected with the prosecutor's basic trial advocacy duties," and under *Imbler* were protected by absolute immunity. *Id.*

## 2.  Service and Execution

Plaintiffs also allege that Goddard "culpably acquiesced in and subsequently ratified the service of warrants and the seizure" of their funds.  We hold that service and execution of seizure warrants, even when performed by a prosecutor, aren't protected by absolute immunity because those acts are functions of police officers, not prosecutors.  *See Kalina*, 522 U.S. at 130–31.  Under *Kalina*, Goddard's supervision of Holmes's service and execution of seizure warrants is likewise a function of a supervising police officer, not a supervising prosecutor.   Service and execution aren't "intimately associated with the judicial phase" of the proceedings.   Goddard therefore can't claim absolute immunity with respect to his supervision of the service and execution of the seizure warrants.

*Van de Kamp* doesn't countenance a different result.  The supervisor's activities in *Van de Kamp* were protected by absolute immunity not because they were the actions of a supervisor or a prosecutor, but because they "concerned the evidence presented at trial."   555 U.S. at 345.   The presentation of evidence is "intimately associated with the judicial phase" of the criminal proceeding whether it's conducted in a direct or supervisory capacity.  *Id.*   But nothing in *Van de Kamp* permits us to grant a supervising prosecutor absolute immunity for supervising an activity that's *not* protected by absolute immunity under *Imbler* and its progeny.  Such a result would eviscerate the distinction drawn by the Supreme Court in  *Kalina*.  Absolute immunity would turn on whether a prosecutor was a supervisor, instead of on whether the function performed was that of an advocate for the state. Rather, *Kalina* controls Goddard's immunity

with respect to service and execution.  Under *Kalina* those functions aren't protected by absolute immunity.

## III.    OFFICIAL   CAPACITY   CLAIM   AGAINST BRNOVICH

The district court granted summary judgment to Horne (who was then Arizona's Attorney General) on the basis that plaintiffs hadn't "alleged or argued how the Attorney General's office violated their constitutional rights."  The district court addressed the claim on the merits even though "[d]efendants considered this claim abandoned and did not respond" in their filings on summary judgment.  Although plaintiffs list the grant of summary judgment in favor of the Attorney General among the issues presented on appeal, their brief does not argue the point or cite any authorities in support of their official capacity claims against the Attorney General.  Because plaintiffs didn't "specifically and distinctly argue" in their opening brief that the district court's grant of summary judgment in favor of the Attorney General was incorrect, this issue is waived.  *See Wagner* v. *Cnty. of Maricopa*, 747 F.3d 1048, 1059 (9th Cir. 2013).

## IV.    CLASS CERTIFICATION

Plaintiffs also argue that the district court abused its discretion in denying their motion for class certification.  We express no opinion on the class certification issue.  The class certification question may be answered quite differently after our opinion and any ruling by the district court on Holmes's

or Goddard's qualified immunity.  The parties may raise the class certification issue in any subsequent appeal.

**AFFIRMED in part, REVERSED in part and REMANDED.**

**The parties shall bear their own costs on appeal.**